# 23-7347-CR

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❯❯◄◄

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

GUTEMBERG DOS SANTOS, AKA SEALED DEFENDANT 1, SCOTT HUGHES,
CECILIA MILLAN, JACKIE AGUILAR, KARINA CHAIREZ,

*Defendants,*

PABLO RENATO RODRIGUEZ, AKA PABLE RENATO RODRIGUEZ,

———————————

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR DEFENDANT-APPELLANT

Peter Neil Katz
LAW OFFICES OF PETER KATZ, LLC
116 Village Boulevard, 2nd Floor
Princeton, New Jersey 08540
609-734-4380

*and*

Andrew J. Frisch
THE LAW OFFICES OF
 ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

*Attorneys for Defendant-Appellant*


(212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

CASE AND JURISDICTIONAL STATEMENT ......................................................1

QUESTIONS PRESENTED AND STANDARDS OF REVIEW ...........................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

BACKGROUND OF THE CASE AND RELEVANT FACTS................................5

1.    The Plea Agreement's Identified Loss of No More than $65 Million, and the Consent Preliminary Order of Forfeiture of $65 Million ....................................................................6

2.    The district judge imposed a sentence of 144 months without addressing Rodriguez's argument that the government breached its plea agreement by claiming loss and gain greater than for which the agreement provided........................................7

    Introduction ......................................................................7

    a.    The especially compelling mitigating factors were not disputed ...........................................8

        (i)    The Distinctly Harsh Conditions of Confinement .......................9

        (ii)    Rodriguez's Exemplary Conduct in Custody..............................11

    b.    The gap between reality and the government's hyperbole .................12

    c.    The government expressly urged the court to consider loss and gain greater than the plea agreement in imposing sentence ......................................................15

    d.    The Court imposed a sentence on 144 months after never sentencing any nontrial nonviolent defendant to more than 77 months ...........................................20

ARGUMENT ..................................................................................21

   I.   THE PLEA AGREEMENT BARRED THE GOVERNMENT
       FROM ARGUING THAT LOSS AND GAIN WAS
       GREATER THAN PROVIDING FOR IN THE
       AGREEMENT ..........................................................................21

   II.  THE DISTRICT COURT'S SILENCE IN RESPONSE TO
       RODRIGUEZ'S CLAIM OF BREACH RENDERED THE
       SENTENCE PROCEDURALLY AND SUBSTANTIVELY
       UNREASONABLE ....................................................................26

   III. THE GOVERNMENT'S ADVOCACY IN
       CONTRAVENTION OF THE PLEA AGREEMENT
       SERVED TO INVALIDATE THE WAIVER OF APPEAL ...................29

   IV. THE COURT SHOULD REMAND THE CASE FOR
       CONSIDERATION OF AMENDMENT 821 TO THE
       UNITED STATES SENTENCING GUIDELINES .................................30

CONCLUSION .............................................................................31

CERTIFICATE OF COMPLIANCE ....................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Rafael L.O. v. Tsoukaris*,
  2020 U.S. Dist. LEXIS 62389 (D.N.J. 2020) .......................................9

*Reda v. Eastman Kodak Co.*,
  233 A.D.2d 914 (4th Dep't 1996)..........................................................5

*Terwilliger v. Terwilliger*,
  206 F.3d 240 (2d Cir. 2000) ........................................................4, 5, 22

*Thakker v. Doll*,
  2020 U.S. Dist. LEXIS 59459 (M.D. Pa. 2020) ...................................9

*United States v. Armstrong*,
  734 Fed. Appx. 45 (2d Cir. 2018)....................................................24, 26

*United States v. Banks*,
  55 F.4th 246 (3d Cir. 2022) .................................................................15

*United States v. Brody*,
  808 F.2d 944 (2d Cir. 1986) .................................................................25

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008) .................................................................24

*United States v. Cherimond*,
  2022 U.S. App. LEXIS 22260 (2d Cir. Aug. 11, 2022) .....................26

*United States v. Chu*,
  714 F.3d 742 (2d Cir. 2013) .................................................................26

*United States v. Enriquez*,
  42 F.3d 769 (2d Cir. 1994) ...................................................................25

*United States v. Jass*,
  569 F.3d 47 (2d Cir. 2009) ...................................................................24

iii

*United States v. Lawlor*,
    168 F.3d 633 (2d Cir. 1999) ............................................................... 23

*United States v. Liriano-Blanco*,
    510 F.3d 168 (2d Cir. 2007) ............................................................... 29

*United States v. Marin*,
    961 F.2d 493 (2d Cir. 1992) ............................................................... 30

*United States v. Mergen*,
    764 F.3d 199 (2d Cir. 2014) ............................................................... 23

*United States v. Palladino*,
    347 F.3d 29 (2d Cir. 2003) ................................................................. 25

*United States v. Pugliese*,
    805 F.2d 1117 (2d Cir. 1986) ............................................................. 26

*United States v. Ready*,
    82 F.3d 551 (2d Cir. 1996), *superseded on other grounds*
    *as stated in United States v. Cook*, 722 F.3d 477 (2d Cir. 2013) ...................... 23

*United States v. Riera*,
    298 F.3d 128 (2d Cir. 2002) ............................................................... 22

*United States v. Riggi*,
    649 F.3d 143 (2d Cir. 2011) ........................................................... 29, 30

*United States v. Rosa*,
    123 F.3d 94 (2d Cir. 1997) ............................................................ 29, 30

*United States v. Taylor*,
    961 F.3d 68 (2d Cir. 2020) ................................................................. 23

*United States v. Vaval*,
    404 F.3d 144 (2d Cir. 2005) ....................................................... 22, 23, 25

*United States v. Wilson*,
    920 F.3d 155 (2d Cir. 2019) ....................................................... 1, 23, 25

iv

**Statutes**

18 U.S.C. § 1349 ..................................................................................1

28 U.S.C. § 1291 ..................................................................................1

United States Code Title 18 ...................................................................1

United States Sentencing Guidelines Amendment 821
    https://www.amendment821.com/ ....................................................31

United States Sentencing Guidelines § 4C1.1(a)..................................31

Case and Jurisdictional Statement

Appellant Pablo Renato Rodriguez appeals from a judgment of the United States District Court for the Southern District of New York (Daniels, U.S.D.J.,), convicting him upon his plea of guilty to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and sentencing him principally to a term of imprisonment of 144 months.  On September 27, 2023,  the district court entered the judgment of conviction.  A17.[1]   On October 10, 2023, a timely notice of appeal was filed.  A248.   The district court had jurisdiction under Title 18 of the United States Code.  This Court has jurisdiction under 28 U.S.C. § 1291 as an appeal from a final judgment.

Questions Presented and Standards of Review

1.      Where the government in a plea agreement identifies fraud loss under the United States Sentencing Guidelines to be no more than $65 million and obtains a defendant's consent to an order of forfeiture of $65 million as part of a negotiated disposition, does the government violate this Court's pronouncements about the government's obligation to hew to the terms of its plea agreements [*see, e.g., United States v. Wilson*, 920 F.3d 155 (2d Cir. 2019)] by arguing at sentencing - - without proof - - that the defendant caused loss and retained proceeds of fraud even

_____

[1]  References preceded by "A" are to the Appendix filed herewith.

1

greater than $65 million, all based on information known to the government when it induced the defendant to plead guilty by using $65 million as the basis for fraud loss and forfeiture?

2.     Should a case be remanded for resentencing to a different judge to assure the defendant's sentencing in compliance with a plea agreement and on accurate facts where a judge at sentencing says nothing when the defendant argues that the government breached the plea agreement by claiming loss and gain greater than identified in the plea agreement; the government expressly urges the judge to impose a sentence that takes into account those greater numbers; and the judge imposes a sentence almost twice as much as he had ever before imposed on any nontrial and nonviolent defendant?

3.     Is it substantively reasonable to impose a sentence of 144 months on a nontrial and nonviolent first offender when a district judge at sentencing appears to consider arguments made by the government in violation of the plea agreement; the defendant surrendered millions more dollars than he illegally obtained; endured the full scope of the pandemic in custody and twice contracted COVID-19 when its consequences were unknown and a vaccine was not yet available; was not permitted to go outside for three years; suffered a broken jaw when cold-cocked by

2

another inmate and could not eat solid food for months; and on another occasion

watched as an inmate with whom he had become friendly was murdered?

4.      Under the circumstances set forth in the questions presented above, should

an appellate court honor a plea agreement's waiver of appeal where the district

judge at sentencing did not address the government's apparent violation of its plea

agreement though defense counsel specifically called it out and instead appears to

have accepted the government's attendant arguments in imposing a sentence

almost double the judge's typical sentence in similar cases?

Interpretations of plea agreements are reviewed *de novo*.  The validity

and scope of an appellate waiver are reviewed *de novo*.  The procedural and

substantive reasonableness of a sentence is reviewed for abuse of discretion.

<u>Introduction and Summary of Argument</u>

District judges are not issued special equipment to distinguish zealous

advocacy from the reality of any particular case.  Judges typically appreciate that

prosecutors and defense counsel may advocate their positions out of adversarial

enthusiasm, righteous faith in their views, or some combination thereof.  Plea

agreements in criminal cases serve as guardrails:  they help define the rules of the

road so that the judge and the parties at sentencing are working from the same

3

facts, just as a contract settles on terms and conditions after negotiations are complete.

The government in this case did not treat its plea agreement with the defendant as a contract containing terms and conditions that resolved disputes after negotiations. While some areas of dispute survived the plea agreement and were the subject of the parties' advocacy at sentencing, the government argued that loss and gain were greater than as set forth in the plea agreement. While the government did not advocate for a specific sentence greater than the agreement's estimate, the government expressly urged the district judge at sentencing to impose a sentence that took the greater (inaccurate) numbers into account.

The district judge said nothing when Appellant's counsel objected to the government's advocacy of greater loss and gain as a breach of the plea agreement. Rather than address the breach, and despite an especially distinctive mix of mitigating factors that compellingly supported Appellant's recommendation of a sentence of 48 months, the district judge imposed a sentence of 144 months, almost twice the greatest sentence the judge had ever imposed for a nontrial and nonviolent defendant.

Just as a signatory to a commercial contract surrenders rights with the reasonable expectation of performance with negotiated terms [*see Terwilliger v.*

4

*Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (quoting *Reda v. Eastman Kodak Co.*, 233 A.D.2d 914 (4th Dep't 1996) ("The contract must be interpreted so as to give effect to, not nullify, its general or primary purpose")], so too does a defendant who signs a plea agreement waive constitutional rights with the reasonable expectation that the government will honor negotiated terms and not endeavor to nullify them. The Court should remand this case for resentencing before a different district judge where the government is required to comply with its plea agreement, and Appellant is sentenced on accurate facts.

<u>Background of the Case and Relevant Facts</u>

1. *The Plea Agreement's Identified Loss of No More than $65 Million,
   and the Consent Preliminary Order of Forfeiture of $65 Million*

By indictment filed August 18, 2020, Rodriguez was charged with conspiring to commit wire fraud, bank fraud, and money laundering and an attendant allegation of forfeiture, *inter alia*, seeking a money judgment representing an amount traceable to the commission of the crime. A17.

On March 8, 2023, Rodriguez pled guilty to one count of conspiracy to commit wire fraud pursuant to a plea agreement drafted by the government. A67. Rodriguez admitted, in substance, that in 2015 he helped found an entity known as the AirBit Club to educate members about cryptocurrencies. Payments for membership in the AirBit Club were made to and held by an entity known as

5

CryptoCapital, which was owned and operated by a man named Oz Yoseph. After Yoseph stole assets of the AirBit Club, rendering the club at least temporarily insolvent, Rodriguez failed to so notify the club's members and continued to encourage new members to join, thereby committing fraud by materially false statements and omissions. A79-81.

As part of Rodriguez's allocution at the guilty plea, the district judge confirmed that the plea agreement identified fraud loss under the Sentencing Guidelines to be no more than $65 million.[2] The district judge also confirmed that, pursuant to the plea agreement, Rodriguez agreed to a money judgment of $65 million, representing "the proceeds traceable to the commission of the crime:"

> THE COURT: And also, pursuant to your plea agreement with the government, you're agreeing to admit to the forfeiture allegation with respect to Count One of the indictment and agreeing to forfeit a sum of money equal to $65 million in United States currency, which the government contends it represents the proceeds traceable to the commission of the crime.
>
> Do you understand that?
>
> THE DEFENDANT: Yes.

A75. Based on Rodriguez's acknowledgment of his consent to a money judgment of $65 million, and the government's concomitant submission of the parties'

---

[2] The terms of the plea agreement are set forth in Rodriguez's presentence report at ¶7. The plea agreement is available from undersigned counsel.

"consent preliminary order of forfeiture" for the court's signature, the district judge issued the order.  A45, A82.   The consent preliminary order authorized the forfeiture of various assets identified therein (valued at between $35 million and $60 million [A82], as well as "a sum of money equal to $65,000,000.00 in United States currency, representing proceeds traceable to the commission of the offense charged in Count One of the indictment [charging conspiracy to commit wire fraud]."  A61.

2. *The district judge imposed a sentence of 144 months without addressing Rodriguez's argument that the government breached its plea agreement by claiming loss and gain greater than for which the agreement provided*

*Introduction*

The parties at sentencing agreed that Rodriguez's range under the Sentencing Guidelines was 188 to 235 months, as identified in the parties' plea agreement based on fraud loss of no more than $65 million.  *See* PSR at ¶ 7.  The Probation Department recommended that Rodriguez be sentenced to 160 months, and the government recommended that Rodriguez be sentenced to 160 months as "a minimum."  A178; *see* PSR at 44.  Rodriguez recommended that he be sentenced to a term of imprisonment of 48 months, including 12 months of home confinement [*see* A95, A102], based principally on especially compelling mitigating factors*,* described below.

7

Despite the government's plea agreement that fraud loss and gain (as reflected in the money judgment for forfeiture) were each valued at $65 million, the government argued at sentencing that loss and gain were both greater than $65 million, and that the court should impose a sentence that took into account the greater numbers. A175-76, A222-27. Rodriguez argued that the government had thereby breached the plea agreement [A215, A230-34], but the district judge did not address or say anything about Rodriguez's claim. Though the judge had never imposed a sentence of greater than 77 months for any nontrial and nonviolent defendant [A114, A128-30], and despite an especially compelling array of mitigating circumstances favoring a variance far more substantial than granted, the district judge imposed a sentence of 144 months. A238.

a. *The especially compelling mitigating factors were not disputed*

While this Court is typically inclined to defer to a district judge's evaluation of factors advanced in support of a downward variance, the district judge's imposition of a sentence of 144 months here despite especially compelling mitigating factors - - coupled with the court's silence when Rodriguez claimed that the government had breached the plea agreement by advocating greater loss and gain than in the plea agreement - - helps shows why this Court should not assume that the same sentence would necessarily have been imposed but for the breach.

8

The government should honor its agreements in every case, but even more so here where compelling mitigating factors should have commanded advocacy tethered to the plea agreement.

### (i) The Distinctly Harsh Conditions of Confinement

Rodriguez endured the pandemic over its full sweep under atypically untenable circumstances. Rodriguez contracted COVID-19 twice, each time developing significant symptoms [A108-09, A235], putting him in true fear of death before vaccinations were available, and before the implications of infections were truly understood. At a time of great need for solace and guidance, Rodriguez was unable to contact family or his counsel. A235.

Rodriguez was housed at Newark's Essex County Correctional Center [A108], a local facility notorious for its incapacity to care for inmates during the pandemic. *See, e.g.*, *Rafael L.O. v. Tsoukaris*, 2020 U.S. Dist. LEXIS 62389 at *7 (D.N.J. 2020) (quoting *Thakker v. Doll*, 2020 U.S. Dist. LEXIS 59459 (M.D. Pa. 2020) ("County jails were not designed with pandemics in mind. To the contrary, they were made to house persons in relatively close contact. In a densely populated area, like Essex County, New Jersey, jails are constructed to handle more persons, whether they be detainees or inmates.").

9

*For three years*, Rodriguez was not permitted to go outside. A108-09. Instead, he endured persistent weeks-long 23-hour lockdowns in a jail cell because of the spread of a deadly virus, staff shortages, and violence among other inmates. *See* A203 ("For most of his time incarcerated - - he was at Essex County Correctional Center in Newark, New Jersey - - he did not go outside. He was never permitted.")

While lodged at the Essex County Jail, Rodriguez was cold-cocked by another inmate, requiring hospitalization and a four-hour emergency surgery for a broken jaw. Rodriguez's jaw was wired shut, he could not eat solid food for months, and he lost thirty pounds. A203, A217, A235. On another occasion, Rodriguez watched as another inmate, with whom Rodriguez had become friendly, was murdered. A217, 235-36. Meanwhile, Rodriguez did not see his two pre-teen children (who live in California) for more than three years [A101] and had genuine reason to believe from COVID-19 alone that he would never see them again.

A former supervising probation officer in the Eastern District of New Year prepared a mitigation report for Rodriguez's sentencing, corroborating the deplorable conditions for people in custody during the pandemic. *See* A216-17. Her conclusion was that "Mr. Rodriguez' experience has been among the worst experiences one can have short of death at any facility" [A218]:

10

I find it really shocking that he has had such, such a life threatening, a continuing life threatening experience. And that should equate to having already been incarcerated for many years, not just three years [in custody as of sentencing]. It is the equivalent to almost, in my view, ten years . . . .

So many defendants have been sentenced based only on COVID. There were some extraordinarily low sentences. Time served was often the sentence in violent cases even that I was working on, because only of COVID, whether or not my clients had COVID. And what [Rodriguez] has experienced is a thousand times worse.

A219.

*(ii) Rodriguez's Exemplary Conduct in Custody*

Despite the unrelenting chaos of the conditions of custody, Rodriguez

- - who had no criminal record or prior arrest - - never incurred even one

disciplinary infraction and, instead, availed himself of every educational

opportunity: as of sentencing, he had completed more than 95 courses (the number

increased after issuance of the PSR) in subject matters as varied as leadership,

mental health, and anger management. A100, A203; PSR at ¶ 131; A203 ("He has

zero tickets, zero infractions. He is a model inmate. He's taken 95 classes to better

himself. It's almost unimaginable how much he's done to try to make himself

better in this time.")

If it was too much to ask the government to temper its advocacy in the

fair context of Rodriguez's character, the people at sentencing who so

11

enthusiastically sang his praises should have at least served as a buffer from

prosecutorial overreach, inhibiting the government from unfairly demonizing

Rodriguez and doing so beyond the four corners of the plea agreement.

Rodriguez's family and friends  characterized him  as "special," "loving," "big

heart," "kind," "humble," "positive," "an unconditional friend," "a guide and role

model," "an inspiration," "God-fearing," "family leader," "positive thinker," "a

great human being," "a person to admire," "respectful," "cheerful," "affectionate,"

"caring," "hard-working," "encourage[s] everyone with a smile on his lips," a

"caretaker," "excellent and loving son," "responsible  father,""empathetic," "loved

by everyone," "full of charisma," "fill[s] our hearts with much love and trust,"

"transmits a very positive energy," "great character," "generous," "down-to-earth,"

"respectful," "promot[es] love [and] family unity," "a good Christian," "very

sensible," "outstanding human values," "dynamic," "dedicated," "altruistic,"

"patient," "devoted father, husband, son, brother, and friend," "the best dad ever,"

"the emotional pillar of his whole family," "provided moral and spiritual support."

A97-98, A188-89.

     b.     *The gap between reality and the government's hyperbole*

        Despite years of investigating the Airbit Club and inviting victims to

identify losses through its victim coordinator and online outreach, the most the

government could do at sentencing was proffer a list of 541 victims who appeared to have lost an aggregate of $792,647.78.  By contrast, Rodriguez voluntarily provided the government with a database of every Airbit transaction, which he believed was complete and immutable (it could not be edited or changed after-the-fact without generating a new line item).  The database supported a defense forensic analysis that determined that total loss to AirBit club members was no more than $2.4 million, and that total payments to AirBit club members had been $860 million.  A125-27, A189-90, A192-93, A195-96.

While disputing the reliability of Rodriguez's proffered forensic analysis, the government did not counter with any analysis of its own.  Instead, the government did not dispute that it had rebuffed Rodriguez's offer to meet and review the database and all of the Airbit Club's finances so that the government would have a complete and accurate calculation of loss - - or at least ask questions.  A196.  Rather than explain why it rejected an opportunity to question Rodriguez about the database and Airbit's finances, the government focused on what it characterized as "aggravating" factors, including its view of "extensive harm caused to victims" [A175], Rodriguez's leadership role in the Airbit Club after paying a penalty to the Securities and Exchange Commission in an unrelated matter [A175], and its view that the Club began as a fraud in 2016 [A179-80], even

though the government did not (and could not) dispute that the Club paid members $860 million and caused actual losses of no more than $2.4 million. *See* A125-27.

Meanwhile, after years of touting the underlying fraud as pervasive from creation of the AirBit Club in 2015 until its demise in 2020 and claiming "extensive harm," the government ultimately acknowledged that it could not actually prove that any particular member was entitled to restitution (at least beyond a total of $792,647.78 to 541 identified club members). *See* Docket Nos. 279, 283. Rodriguez's counsel (accurately) characterized the government's position at sentencing as "a little bit of a Texas two step with regard to the restitution . . . . Your Honor asked them directly, and they have not given you even a range of what that number is. All they've said is it's too hard to figure it out." A192.

Meanwhile, Rodriguez forfeited assets valued at $70 million upon his arrest; he agreed to the additional money judgment of $65 million which was the subject of the consent preliminary order as part of the plea agreement; and he agreed to forfeit other specifically identified assets valued by the parties at between at additional $35 million to $60 million on top of the $65 million. *See* A189. Thus, Rodriguez forfeited assets *52 times* greater than the $2.4 million of total losses demonstrated by the forensic analysis [*see* A201, A205-06, A209], and

14

assets *166 times* greater than the amount of the restitution [$792,647.78] to the 541 victims identified by the government.

    *c.  The government expressly urged the court to consider loss and gain greater than the plea agreement in imposing sentence*

       Institutional deference to the government may indulge prosecutorial advocacy that failure of proof results from complexity, not absence of proof, and prosecutorial theories of intended loss supercede actual loss, at least in this Circuit, and at least for now. *See United States v. Banks,* 55 F.4th 246 (3d Cir. 2022) (a defendant who intends loss should not be sentenced the same as a defendant who causes actual loss). But if the rules of the road indulge such prosecutorial theorizing, that road here is paved with the government's plea agreement, which should have restricted prosecutorial swerving.

       Pursuant to the terms of the plea agreement, some of the parties' competing views were fair debate at sentencing and vested in the discretion of the district judge. For example, the parties sharply disputed whether the AirBit Club was a fraud from its inception or became fraudulent after its insolvency, and whether club members truly suffered any aggregate losses in excess of the government's proof of actual losses of $792,647.78 or even Rodriguez's own acknowledgment that losses appeared to total no more than $2.4 million.

15

But the plea agreement did not permit the government's advocacy that loss and gain were greater than the $65 million set forth in the plea agreement and concomitant money judgment, or that the district judge should consider such greater numbers in imposing sentence. Thus, despite the plea agreement's intended loss of $65 million and constituent money judgment of $65 million, the government claimed that Rodriquez had "successfully hidden a portion of the crime proceeds" [A74-75], which "remains missing," and had been "disbursed to various account and wallets that we can no loner trace or really have any hope of accessing." A176.

Defense counsel adamantly objected, explaining that such additional gain "doesn't exist," "[h]e just doesn't have that," [A192], and focusing the judge on the terms of the plea agreement:

> In fact, the government has agreed in the plea agreement that the intended loss and the forfeiture is maxed out at $65 million. If they now have over $100 million, what is it that [they] think [they're] looking for? They can't by definition, according to the government, according to the plea agreement, they can't be seeking more money.
>
> They can't say, oh, he has this money secreted from Airbit Club, it's all this horrible stuff, it's terrible. They can't do [that]. And they are, but they really can't logically, because they have agreed that $65 million is the total top, and that's the forfeiture amount.
>
> And he's even -- and we're agreeing to forfeit I think double that, and the government says a hun -- $35 million more. So it's kind of - -

16

it's kind of a red herring, Judge, [for the government] to say – again, to make this kind of smoke and mirrors:  This is really horrible.  This is really humungously terrible.  One of the worst things ever.  And he's the top of the worst.

But when you break it down and you actually look at [t]he details, it is just not the case.  And, in fact, it flies in the face of what the government has agreed [in the plea agreement and consent order of forfeiture] is his responsibility.

A215.

The government nonetheless persisted in claiming that Rodriguez had secreted millions of dollars of ill-gotten gain beyond the $65 million identified in the plea agreement, expressly urging the inference that true loss and gain included assets hidden overseas or otherwise transferred and beyond the government's reach:  "And we do know - - there is evidence, it is not speculation - - that there are funds that remain missing that the government will never recover" [A222], "that is why, your Honor, the government's position is, is that the defendant maintains a large portion of his profits from the scheme."  A225; *see* A223-24.

Lest there be any doubt about the government's position (and attendant breach of the plea agreement), it expressly tied losses and gains *in excess of the plea agreement it drafted* to the amount of imprisonment the court should impose:

17

[T]he fact that the defendant gets to walk away with money, with Bitcoin, points to a greater need for specific deterrence.  It also points to a greater need for general deterrence, to show others - - as I said, there are many of these copycat multi-level marketing crypto schemes - - to show them that crime doesn't pay.  You can't just get to serve a few years in jail and get to keep a lot of the money, and it balances out and it's worth it.  That is not a message that this Court should be sending.

A226-27.

Rodriguez's counsel called out the government for violating the plea

agreement:

They have agreed to 65 million. Today they are saying, no, it's actually more than that, Judge, and you should take into account this other Bitcoin that might be out there somewhere that maybe he has, we don't really know, as profit from his criminal scheme.

But the government has already agreed that the profit that he got is $65 million. That's the only way you can read the forfeiture statute, because you can can't forfeit something that was not the proceeds of the criminal endeavor.

So I think it is, you know, with all due respect, a bit disingenuous to now say it is a much bigger number and try to make him look like he's this person who is trying to deceive the Court.  Because that is really what they're trying to do, say he's really a bad guy.  Don't believe anything he said.

The database that we have had for three years, they say it would take a lot of experts to look at.  Did they hire an expert to do it?

We did.  And we submitted something to the Court.

Have they?

18

Have they sat down and asked, Okay, Mr. Rodriguez we have some
questions about this. We are not so sure about this, but tell us about
X, Y, and Z, 1, 2, 3. They never did that.

Did they go and hire an expert? It is the government. They
certainly can afford to hire an expert to analyze this and come before
your Honor and say, look, Judge, we know there are this many
victims. We know there is this much money that is out there.

They didn't do that. Instead, they agreed with the defense that the
cap is $65 million. They provide no information about victims except
for the 540, $792,000 -- the 540 victims, the $792,000 here.

[S]o, your Honor, I think the government cannot stand here today and
tell you it's more than $65 million. They have agreed that is the most
it is, and he's turned over -- the government hold you today -- a
hundred million. What are we talking about? There is no -- nothing
else to get.

A230-32.

The prosecutor attempted to explain away her breach of the plea

agreement by claiming that the government had agreed in the plea agreement to

loss of $65 million and a money judgment of $65 million, but had not agreed to "a

maximum profit amount for this defendant." A233. Rodriguez's counsel called

out the government's untenable position:

Judge, that is the most unbelievable thing I have ever heard. The
government is standing here before the Court saying we are willing to
let someone keep 65 million because we say it is proceeds of the
offense, but we don't want to take it back from him. Now they are
going to say, oh, well - - parse these words and say, well, it is only
part of the profits.

19

In what other case has the government ever said a defendant can keep proceeds of the offense. I have never ever seen that. Not one penny, let alone sixty-five or a hundred million dollars.

A234.

> d. *The Court imposed a sentence on 144 months after never sentencing any nontrial nonviolent defendant to more than 77 months*

The district judge did not address or say anything about Rodriguez's argument that the government had breached its plea agreement by advocating loss and gain greater than for which the agreement provided. Instead, the district judge animated the government's advocacy that the court send a "message" that "crime doesn't pay," and "the defendant [does not] get[] to walk away with money," by rejecting Rodriguez's recommended sentence of 48 months and imposing a sentence of 144 months. A238.

In advance of sentencing, Rodriguez's counsel surveyed 59 cases in which the district judge below had imposed sentence for nontrial nonviolent defendants over twenty years, the apparent universe of such cases. The most that the district judge had ever imposed was 77 months. A114, A128-30, A197. The record of this case does not reasonably permit the conclusion that the district judge ignored the government's breach and hewed to the plea agreement after the

20

government made arguments that violated the agreement and urged that the greater numbers be taken into account.

Argument

I

The Plea Agreement Barred the Government From Arguing that
Loss and Gain Was Greater than Providing for in the Agreement

Rodriguez agreed to resolve a hotly-contested claim of pervasive fraud with a plea agreement that memorialized a negotiated resolution of loss and gain. While the parties reserved their respective rights to argue whether the Airbit Club was a fraud from the beginning or became fraudulent when its business continued despite its developing insolvency, they agreed that Rodriguez would consent to a money judgment of $65 million based on a range under the Sentencing Guidelines corresponding to loss of no more than $65 million.

At sentencing, the government breached its agreement. Though the government did not expressly urge the district judge to impose a particular sentence in excess of the applicable range, it urged the district judge to take into account purportedly greater loss and gain than provided for in the plea agreement in evaluating Rodriguez's compelling grounds for a substantial downward variance and in fashioning a sentence that would serve specifically and generally to deter:

21

[T]he fact that the defendant gets to walk away with money, with Bitcoin, points to a greater need for specific deterrence. It also points to a greater need for general deterrence, to show others - - as I said, there are many of these copycat multi-level marketing crypto schemes - - to show them that crime doesn't pay. You can't just get to serve a few years in jail and get to keep a lot of the money, and it balances out and it's worth it. That is not a message that this Court should be sending.

A226-27. In addressing the chasm between the government's claim that the Airbit Club was a fraud from the onset with its failure to prove the right of club members to remotely commensurate restitution, Rodriguez's counsel criticized the government's approach as "a little bit of a Texas two step." A192. So here. On loss and gain, the government gave lip service to the plea agreement's key term while urging the district judge to ignore it. *See Terwilliger*, 206 F.3d 240 at 245-46 ("The contract must be interpreted so as to give effect to, not nullify, its general or primary purpose.") (citation omitted).

This Court "review[s] interpretations of plea agreements *de novo* and in accordance with principles of contract law." *United States v. Wilson*, 920 F.3d 155, 162 (citing *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002). "Moreover, because plea bargains require defendants to waive fundamental constitutional rights, prosecutors are held to meticulous standards of performance." *Wilson*, 920 F.3d at 162 (citing *United States v. Vaval*, 404 F.3d 144, 152-53 (2d

22

Cir. 2005).  "[W]e construe plea agreements strictly against the government and do not 'hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness.'" *Wilson*, 920 F.3d at 162  (quoting *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999)); *United States v. Taylor*, 961 F.3d 68, 82 (2d Cir. 2020) ("A defendant's reasonable expectations may be breached . . . where the Government's deviation produces serious unfairness for the defendant.") (quoting *Wilson*, 920 F.3d at 163); *United States v. Mergen*, 764 F.3d 199, 208-09 (2d Cir. 2014) (*citing United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996), *superseded on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013) ("[I]t is quite settled that "courts construe plea agreements strictly against the Government.  This is done for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power.").

The inference that the district judge here accepted the government's arguments about loss and gain in imposing sentence is too strong to cast aside, and for at least three independent reasons.  *First*, the judge imposed a sentence of 144 months immediately after Rodriguez objected to the government's breach of the plea agreement, but the judge said nothing about Rodriguez's objection; the

23

government should not be permitted to breach a plea agreement and infer absolution from a judge's silence after an objection is registered. *See United States v. Armstrong*, 734 Fed. Appx. 45, 47-48 (2d Cir. 2018) (remanding for resentencing to ensure that the sentence is not influenced by an erroneous fact and to give the district court an opportunity to clarify the reasons for the particular sentence imposed).

      *Second*, the district judge in over twenty years on the bench had never before imposed a sentence of more than 77 months on a nontrial nonviolent defendant. *See* A114, A128-30, A197. This Court should not infer that the judge would have imposed the same sentence on Rodriguez but for the government's unfair advocacy. *See United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (a district court's statement of reasons must at least be "adequate" to permit "meaningful appellate review"); *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) (recognizing - - unlike Rodriguez's case - - that where the "record indicates clearly that the district court would have imposed the same sentence in any event" any procedural error "may be deemed harmless") (internal quotation marks omitted).

      *Third*, as discussed in greater detail below, the circumstances favoring a very substantial downward variance were too compelling to warrant the relatively

modest variance granted by the court - - even given the broad range of discretion among district judges tolerated by appellate protocols.

      "In general, the remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement." *Wilson*, 920 F.3d at 168 (quoting *Vaval*, 404 F.3d at 154 (internal quotation marks and brackets omitted) (quoting *United States v. Brody*, 808 F.2d 944, 947 (2d Cir. 1986)). "[T]he choice between the remedies of resentencing or plea withdrawal 'is generally a discretionary one guided by the circumstances of each case.'" *Wilson*, 920 F.3d at 168 (quoting *Vaval*, 404 F.3d at 156 (quoting *United States v. Palladino*, 347 F.3d 29, 34 (2d Cir. 2003)). In cases where specific performance is the appropriate remedy, we typically remand the case for resentencing before a different district judge because "[t]he effect of the government's breach of its commitment is difficult to erase" and "it is likely that the same judge would reach the same result as he reached before." *Wilson*, 920 F.3d at 168 (quoting *United States v. Enriquez*, 42 F.3d 769, 772 (2d Cir. 1994).

25

II

The District Court's Silence in Response to Rodriguez's Claim of Breach
Rendered the Sentence Procedurally and Substantively Unreasonable

Any consideration of the government's advocacy on loss and gain in excess of the plea agreement served to violate Rodriquez's right as a matter of due process to be sentenced on accurate information and rendered sentencing procedurally unreasonable. *See United States v. Armstrong*, 734 Fed. Appx. at 47-48 (a sentence is procedurally unreasonable if it is "based on clearly erroneous facts") (quoting *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013) (internal quotation marks omitted)). The sentencing court should assure itself that "the information upon which it relies in sentencing defendants is both reliable and accurate." *United States v. Cherimond*, 2022 U.S. App. LEXIS 22260 (2d Cir. Aug. 11, 2022) (quoting *United States v. Pugliese*, 805 F.2d 1117, 1124 (2d Cir. 1986)).

Any such consideration also contributed to the substantive unreasonableness of the sentence imposed. While this Court typically defers to sentences that might arguably be located at the outer edges of a permissible range, a sentence of 144 months under Rodriguez's circumstances is outside that range,

should offend the Court's sensibilities, and is shocking by the standard of this district judge's twenty-year career on the bench.

The Court may elect to demur for now on the substantive unreasonableness of Rodriguez's sentence and remand to assure that the sentence accords with due process. If not, the lodestar that should guide the Court is not the sensibilities of any particular judge, but public confidence in the administration of justice. Rodriguez was a first offender for a nonviolent crime for which the government was unable to prove restitution commensurate with its hyperbole. The government all but shrugged off Rodriguez's analysis which showed no more than $2.4 million of actual loss compared with actual payments to club members of $860 million. While the government was not obliged to accept Rodriguez's offer to meet so he could explain and answer questions about the numbers, the government was and remains unable to advance a view of loss warranting anything near a sentence of 144 months.

Perhaps deference to the government permits short shrift to Rodriguez's surrender of millions more dollars than he illegally obtained. But the record does not support the government's exaggerated claims of actual loss. Perhaps the pandemic's dissipation and the development of vaccines makes custody during COVID-19 seem tolerable in retrospect. But Rodriguez endured

27

the full scope of the pandemic in custody and twice contracted COVID-19 when its consequences were unknown and a vaccine was not yet available; he was not permitted to go outside for three years; he did not see his two pre-teen children for three years and had reason believe he would never see them again.

On top of those bases for a very substantial downward variance, Rodriguez suffered a broken jaw when cold-cocked by another inmate and could not eat solid food for months; and on another occasion watched as another inmate with whom he had become friendly was murdered. The former probation officer who submitted a report on Rodriguez's behalf had it right: "Mr. Rodriguez' experience has been among the worst experiences one can have short of death at any facility." A218.

Even if the government had actual proof of the loss and gain it alleged, a sentence of 144 months would have been excessive. But the government lacked such proof and made unprovable arguments in violation of the plea agreement that served significantly to nullify grounds for a far more substantial downward variance than was granted. This Circuit's traditions - - and the public's expectation in the fair administration of justice - - required a different and far more just result.

28

III

The Government's Advocacy in Contravention of the
<u>Plea Agreement Served to Invalidate the Waiver of Appeal</u>

A defendant's request for appellate review notwithstanding a waiver "will cause [this Court] to examine carefully the facts of the case and to look at the manner in which the agreement and the sentence were entered into and applied to determine whether it merits our review." *United States v. Rosa*, 123 F.3d 94, 101 (2d Cir. 1997). "No circuit has held these contractual waivers are enforceable on a basis that is unlimited and unexamined." *Id.* at 98, 100 ("We are not prepared today to outline an exhaustive list of the circumstances under which we would or would not accept . . . an appeal" that has nominally been waived) (citations omitted).

The "decisive considerations" motivating this Court's decision to enforce a waiver of appeal are the "nature of the right at issue" and "whether the sentence was reached in a manner that the plea agreement did not anticipate." *United States v. Riggi*, 649 F.3d 143, 148 (2d Cir. 2011) (quoting *United States v. Liriano-Blanco*, 510 F.3d 168, 174 (2d Cir. 2007)). "A defendant who waives his

right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *Rosa*, 123 F.3d at 98 (quoting *United States v. Marin*, 961 F.2d 493, 496 (2d Cir. 1992)).

Here, to borrow from *Riggi*, Rodriguez's sentence was imposed on a record plainly not anticipated by the plea agreement. The parties negotiated a loss of $65 million under the Sentencing Guidelines and a concomitant money judgment of $65 million as resolution of a key area of dispute, not as a minimum floor from which the government was free to advocate for more. Rodriguez's waiver of appeal was part of the plea agreement that ostensibly resolved questions of loss and gain. The government's advocacy in contravention of the plea agreement served to invalidate the waiver of appeal on which it was substantially predicated.

IV

The Court Should Remand the Case for Consideration of
Amendment 821 to the United States Sentencing Guidelines

If the Court does not remand for resentencing for the reasons stated above, it should remand for resentencing based on Amendment 821 to the Sentencing Guidelines, which was made retroactive in August 2023 and became

effective in November 2023,[3] both dates after Rodriguez filed his notice of appeal. *See* A248 (notice of appeal). The amendment qualifies defendants like Rodriguez with no criminal history points for a two-level downward adjustment to the applicable adjusted offense level. *See* U.S.S.G. § 4C1.1(a).

CONCLUSION

For these reasons, the case should be remanded for resentencing to a different district judge or at least remanded for resentencing so that the parties may be heard on Amendment 821 to the Sentencing Guidelines.

Dated: January 22, 2024

Respectfully submitted,

*/s/ Peter Katz*
Law Offices of Peter Katz, LLC
116 Village Blvd., 2nd Floor
Princeton, New Jersey 08540
(609) 734-4380
*peter@pkatzlegal.com*

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

---

[3] *See https://www.amendment821.com/*

31

Certificate Of Compliance With FRAP 32(A)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,766 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.


Dated:  New York, New York
            January 22, 2024

                                    Respectfully submitted,

                                    */s/ Peter Katz*
                                    Law Offices of Peter Katz, LLC
                                    116 Village Blvd., 2nd Floor
                                    Princeton, New Jersey 08540
                                    (609) 734-4380
                                    *peter@pkatzlegal.com*

                                    Andrew J. Frisch
                                    The Law Offices of Andrew J. Frisch, PLLC
                                    40 Fulton Street, 17th Floor
                                    New York, New York 10038
                                    (212) 285-8000
                                    *afrisch@andrewfrisch.com*