# 23-7347

*To Be Argued By*:
CECILIA VOGEL

## United States Court of Appeals
**FOR THE SECOND CIRCUIT**
**Docket No. 23-7347**

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

PABLO RENATO RODRIGUEZ,
also known as Pable Renato Rodriguez,

*Defendant-Appellant*,

GUTEMBERG DOS SANTOS, also known as Sealed Defendant 1, SCOTT HUGHES, CECILIA MILLAN, JACKIE AGUILAR, KARINA CHAIREZ,

*Defendants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the Southern District of New York, Attorney for the United States of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

KIERSTEN A. FLETCHER,
SAMUEL RAYMOND,
CECILIA VOGEL,
OLGA I. ZVEROVICH,
*Assistant United States Attorneys, Of Counsel.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Offense Conduct . . . . . . . . . . . . . . . . . . 2

1. The Airbit Club Scheme . . . . . . . . . . . . 2

2. Laundering of Airbit Club Scheme Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . 7

3. The Government's Efforts to Recover Proceeds of the Scheme . . . . . . . . . . . . . 8

B. The Plea Agreement and the Guilty Plea . 10

C. The Sentencing Proceedings . . . . . . . . . . . 13

1. The Presentence Report and the Parties' Sentencing Submissions . . . . 13

2. The Sentencing. . . . . . . . . . . . . . . . . . . 18

ARGUMENT:

POINT I—Rodriguez's Appeal Should Be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 27

1. Breach of a Plea Agreement . . . . . . . . 27

2. Waiver of Right to Appeal . . . . . . . . . . 28

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 29

PAGE

1. The Government Did Not Breach the Plea Agreement . . . . . . . . . . . . . . . . . . 29

2. Rodriguez Knowingly and Voluntarily Waived His Right to Appeal . . . . . . . . 39

POINT II—Rodriguez's Sentence Was Procedurally and Substantively Reasonable . . . . . . . . . . . . . 40

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 41

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 44

POINT III—This Court Should Not Remand for Resentencing Based on Amendment 821 to the Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## TABLE OF AUTHORITIES

*Cases*:

*Gall v. United States*,
552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . 41, 42

*In re Altro*,
180 F.3d 372 (2d Cir. 1999) . . . . . . . . . . 27, 28, 37

*Puckett v. United States*,
556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Alvarado*,
720 F.3d 153 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 47

PAGE

*United States v. Amico*,
416 F.3d 163 (2d Cir. 2005) . . . . . . . . . . 28, 34, 35

*United States v. Banks*,
464 F.3d 184 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 41

*United States v. Bonilla*,
618 F.3d 102 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 47

*United States v. Borden*,
16 F.4th 351 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 29

*United States v. Broxmeyer*,
699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . 42, 43, 49

*United States v. Castillo*,
896 F.3d 141 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 41

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . 43, 44

*United States v. Cimino*,
381 F.3d 124 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 28

*United States v. Coston*,
737 F.3d 235 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 29

*United States v. DeJesus*,
219 F.3d 117 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 29

*United States v. DiRose*,
586 F. App'x 808 (2d Cir. 2014) . . . . . . . . . . . . . . 48

*United States v. Fernandez*,
443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . 42, 47, 48

*United States v. Frazier*,
805 F. App'x 15 (2d Cir. 2020) . . . . . . . . . . . . . . . 38

PAGE

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . . 42, 46

*United States v. Gasperini*,
894 F.3d 482 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 42

*United States v. Gomez-Perez*,
215 F.3d 315 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 29

*United States v. Griffin*,
510 F.3d 354 (2d Cir. 2007) . . . . . . . . . . 27, 28, 33

*United States v. Helm*,
58 F.4th 75 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . 27

*United States v. Howard*,
299 F. App'x 885 (11th Cir. 2008) . . . . . . . . . . . . 34

*United States v. Jesurum*,
819 F.3d 667 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 50

*United States v. Jones*,
460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 43

*United States v. Jones*,
878 F.3d 10 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . 49

*United States v. Kilkenny*,
493 F.3d 122 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 50

*United States v. Lenoci*,
377 F.3d 246 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 28

*United States v. Major*,
No. 23-6166-CR, 2024 WL 1404577
(2d Cir. Apr. 2, 2024) . . . . . . . . . . . . . . . . . . . . . . 50

PAGE

*United States v. Martinez*,
721 F. App'x 75 (2d Cir. 2018) . . . . . . . . . . . . . . . 33

*United States v. McIntosh*,
753 F.3d 388 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 41

*United States v. Messina*,
806 F.3d 55 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . 44

*United States v. Moschella*,
727 F.3d 888 (9th Cir. 2013) . . . . . . . . . . . . . . . . 34

*United States v. Perez-Frias*,
636 F.3d 39 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . 43

*United States v. Pope*,
554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 43

*United States v. Riera*,
298 F.3d 128 (2d Cir. 2002) . . . . . . . . . . . . . . 27, 35

*United States v. Rigas*,
583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 44

*United States v. Riggi*,
649 F.3d 143 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 29

*United States v. Romano*,
794 F.3d 317 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 34

*United States v. Ryan*,
806 F.3d 691 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 42

*United States v. Salcido-Contreras*,
990 F.2d 51 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 40

*United States v. Sehgal*,
480 F. App'x 16 (2d Cir. 2012) . . . . . . . . . . . . . . . 33

PAGE

*United States v. Tokhtakhounov*,
607 F. App'x 8 (2d Cir. 2015) . . . . . . . . . . . . . . . . 32

*United States v. Vaval*,
404 F.3d 144 (2d Cir. 2005) . . . . . . . . . . . . . . 28, 39

*United States v. Wagner-Dano*,
679 F.3d 83 (2d Cir. 2012) . . . . . . . . . . . . . . . 42, 47

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1956(h). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3582(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . 50

U.S.S.G. amend. 821 . . . . . . . . . . . . . . . . . . . . . 49, 50

U.S.S.G. amend. 825 . . . . . . . . . . . . . . . . . . . . . . . . 50

U.S.S.G. § 1B1.10 . . . . . . . . . . . . . . . . . . . . . . . . . . 51

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. § 2B1.1(b)(1)(L) . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 4C1.1 . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

U.S.S.G. § 4C1.1(a)(10) . . . . . . . . . . . . . . . . . . . . . . 50

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 23-7347

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

PABLO RENATO RODRIGUEZ, also known as Pable Renato Rodriguez,

*Defendant-Appellant,*

GUTEMBERG DOS SANTOS, also known as Sealed Defendant 1, SCOTT HUGHES, CECILIA MILLAN, JACKIE AGUILAR, KARINA CHAIREZ,

*Defendants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Pablo Renato Rodriguez appeals from a judgment of conviction entered on September 27, 2023, in the United States District Court for the Southern District of New York, by the Honorable George B. Daniels, United States District Judge, following Rodriguez's guilty plea.

Superseding Indictment S1 20 Cr. 398 (GBD) (the "Indictment") was filed on August 18, 2020, in three counts. Count One charged Rodriguez with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Two charged Rodriguez with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. Count Three charged Rodriguez with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

On March 8, 2023, Rodriguez appeared before Judge Daniels, withdrew his previous plea of not guilty, and pleaded guilty to Count One of the Indictment pursuant to a written plea agreement with the Government. In the plea agreement, Rodriguez stipulated, *inter alia*, that he would not appeal a term of imprisonment of 235 months or less.

On September 26, 2023, Judge Daniels sentenced Rodriguez principally to a term of 144 months' imprisonment.

Rodriguez is serving his sentence.

## Statement of Facts

### A. The Offense Conduct

#### 1. The Airbit Club Scheme

Between 2015 and August 2020, Rodriguez operated Airbit Club, a purported cryptocurrency mining and trading company that falsely promised to earn its investors guaranteed profits in exchange for cash investments (the "Airbit Club Scheme" or the "Scheme").

(PSR ¶ 16).[1] Rodriguez and his co-conspirators recruited investors to Airbit Club by claiming that their money would be invested in cryptocurrency trading and mining, which would generate guaranteed passive returns on the investments. (PSR ¶ 17). In reality, Airbit Club did not engage in any cryptocurrency trading or mining and thus did not generate any returns for investors. (PSR ¶¶ 17, 28). Instead, Rodriguez and his co-conspirators used investors' money for personal expenses and to further promote Airbit Club through public promotional events and sponsorships. (PSR ¶ 17). From the inception of the Scheme in 2015, Rodriguez diverted Airbit Club investor funds for personal use, such as payments to Hugo Boss, BMW, Mercedes Benz, Rolex, and Rodriguez's personal credit card. (PSR ¶ 45).

Rodriguez and co-defendant Gutemberg Dos Santos were the founders and owners of Airbit Club. (PSR ¶ 16). Rodriguez and Dos Santos operated Airbit Club on a global scale, recruiting investors from Latin America, Russia, Asia, and the United States, among

---

[1] "PSR" and "Presentence Report" refer to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Rodriguez's sentencing; "Br." refers to Rodriguez's brief on appeal; "A." refers to the appendix filed with that brief; "Add." refers to the Addendum filed with this brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

other places. (PSR ¶¶ 16, 31). They ran Airbit Club as a multilevel marketing company, also known as a "pyramid scheme." (PSR ¶ 17). At the top of the pyramid were Rodriguez and Dos Santos, and below them was the "Master Council," a group of senior promoters who recruited numerous other lower-level promoters and investors. (PSR ¶¶ 16, 17, 30). In addition to telling investors that they could earn passive returns on their own investments, Rodriguez and his co-conspirators told investors that they could earn additional returns by recruiting new investors in their "downline," *i.e.*, below them in the pyramid. (PSR ¶ 17).

Rodriguez and Dos Santos created the Airbit Club pitch and taught Master Council members how to pitch Airbit Club. (PSR ¶ 28). To recruit investors, Rodriguez and his co-conspirators hosted numerous in-person promotional events, ranging from lavish international galas attended by thousands to small community-based presentations. (PSR ¶¶ 31-32). Rodriguez and his co-conspirators heavily promoted Airbit Club on social media and through live online presentations. (PSR ¶ 33).

Most Airbit Club investors lacked technical knowledge regarding cryptocurrency, but they invested because Rodriguez and his co-conspirators promised guaranteed daily returns on their investments. (PSR ¶ 29). Investors typically made their investments by providing cash or checks to promoters, and the promoters, Rodriguez, or Dos Santos converted the fiat payments to Bitcoin, which Rodriguez and Dos Santos then controlled. (PSR ¶ 29). As the Scheme progressed, at times, Airbit Club accepted

Bitcoin payments from investors. (PSR ¶ 29). Promoters provided investors with accounts on Airbit Club's "Back Office"—a website on which investors purportedly could watch their investments grow as promised. (PSR ¶ 29). In reality, the investment returns listed on the Back Office accounts were not real, as Airbit Club did not engage in cryptocurrency trading or mining for investors. (PSR ¶ 29). Rodriguez, with the assistance of programmers, controlled the Back Office. (PSR ¶ 29).

Rodriguez and Dos Santos decided which investors received payouts. (PSR ¶ 38). Rodriguez and Dos Santos operated Airbit Club as a Ponzi scheme, using funds from new investors to partially pay out existing investors. (PSR ¶ 18). Over time, starting as early as 2016, investors were unable to collect any returns or recoup their initial investments. (PSR ¶¶ 18, 38). By 2018, investors were limited to withdrawing a few hundred dollars at a time, were unable to withdraw any funds at all, or were charged significant fees in the range of 50% to withdraw funds. (PSR ¶ 38). Rodriguez and his co-conspirators ignored investors' withdrawal requests and complaints regarding their inability to withdraw their funds, and they closed the Back Office accounts of investors who complained to law enforcement. (PSR ¶¶ 18, 41). Rodriguez and his co-conspirators also provided excuses to investors who were unable to withdraw, including by falsely claiming that withdrawals were suspended because the Back Office website was being upgraded or because of COVID-19. (PSR ¶ 40). As an alternative means to make money, Rodriguez and his co-conspirators encouraged promoters and investors to recruit new investors, take the

cash investments from those new investors for themselves, and, in exchange, transfer portions of their Back Office account balances to the new investors. (PSR ¶ 39). Despite knowing that investors were unable to make withdrawals, Rodriguez continued to promote Airbit Club and recruit new investors until his arrest in August 2020. (PSR ¶ 42). Numerous investors around the world lost their money to the Airbit Club Scheme. (PSR ¶ 18).

Before launching Airbit Club, Rodriguez and Dos Santos promoted two other similar multilevel marketing investment schemes that collapsed, WCM777 and Vizinova. (PSR ¶ 19). In 2013, Rodriguez and Dos Santos were senior promoters of WCM777, which the U.S. Securities and Exchange Commission (the "SEC") described as a $65 million Ponzi scheme. (PSR ¶¶ 20-23). WCM777 collapsed in 2014, after the SEC brought an emergency action to halt its promotional activity. (PSR ¶ 23). By 2014, Rodriguez and Dos Santos launched Vizinova, which, similar to Airbit Club, promised investors guaranteed daily returns. (PSR ¶ 24). In 2017, the SEC filed a civil enforcement complaint alleging that Rodriguez and Dos Santos had diverted $1.4 million of Vizinova investor funds for the purchase of luxury goods. (PSR ¶ 26). Rodriguez and Dos Santos settled with the SEC by paying $1.7 million in disgorgement and penalties using funds diverted from Airbit Club. (PSR ¶ 26).

### 2. Laundering of Airbit Club Scheme Proceeds

Rodriguez and Dos Santos used various increasingly sophisticated methods to launder millions of dollars in proceeds of the Airbit Club Scheme. (PSR ¶¶ 43-57, 60-66). Rodriguez, Dos Santos, and their co-conspirators initially primarily maintained Airbit Club proceeds in cash, but over time they began to use third-party cryptocurrency brokers to convert investor cash to Bitcoin. (PSR ¶¶ 44-57). Crypto Capital was one of the primary third-party cryptocurrency brokers that Rodriguez and Dos Santos used to launder Airbit Club proceeds. (PSR ¶ 50).

In 2018, after experiencing delays and problems with making withdrawals from Crypto Capital, Rodriguez and Dos Santos withdrew 10,000 Bitcoin, representing Airbit Club proceeds, from Crypto Capital and stored the Bitcoin in cold cryptocurrency wallets controlled by Rodriguez. (PSR ¶ 58).[2] Specifically, Rodriguez maintained the 10,000 Bitcoin in multiple paper

---

[2] By late 2019, Rodriguez and Dos Santos stopped using Crypto Capital entirely after law enforcement seized various Crypto Capital accounts and Crypto Capital's founder kept 1,500 Bitcoin in Airbit Club proceeds. (PSR ¶ 59). In 2019, Crypto Capital's founder and others were indicted in the Southern District of New York on various bank fraud, wire fraud, money laundering, and unlicensed money transmitting charges in connection with Crypto Capital in *United States v. Reginald Fowler, et al.*, No. 19 Cr. 254 (ALC). (PSR ¶ 50).

wallets stored in a safe in Guatemala. (PSR ¶ 58).[3] Rodriguez physically created the paper wallets with his two brothers at an office in Guatemala used by Master Group—a Guatemalan company that Rodriguez owned and used to launder Airbit Club proceeds and to conduct Airbit Club activity. (PSR ¶¶ 52, 58).[4] The 10,000 Bitcoin was worth between $60 million and $90 million at the time of the transfer in 2018 and approximately $265 million at the time of Rodriguez's sentencing in 2023. (A. 150).

### 3. The Government's Efforts to Recover Proceeds of the Scheme

Rodriguez was arrested in August 2020 and detained pending trial. (PSR ¶¶ 66-67). After his arrest,

---

[3] A cold cryptocurrency wallet stores the keys to access the Bitcoin offline, meaning not connected to the Internet. (PSR ¶ 58). A paper wallet is a type of cold cryptocurrency wallet consisting of a physical printout that includes an alphanumeric string of characters and a QR code that are the keys required to access and transfer the Bitcoin associated with that wallet. (PSR ¶ 58). The Bitcoin associated with a paper wallet cannot be seized or transferred without the paper wallet. (PSR ¶ 58).

[4] Dos Santos, who cooperated with the Government after his arrest, was present at the office in Guatemala when Rodriguez and his brothers created the paper wallets to store the 10,000 Bitcoin representing Airbit Club proceeds transferred from Crypto Capital. (A. 222-23).

as part of his ultimately abandoned effort to cooperate with the Government, Rodriguez agreed to transfer any Bitcoin he controlled personally and any Bitcoin representing Airbit Club's investor holdings to a Bitcoin wallet controlled by law enforcement. (PSR ¶ 68). In January 2021, Rodriguez coordinated—from jail—the transfer to law enforcement of approximately 1,323 Bitcoin, worth approximately $36 million at the time the Presentence Report was prepared. (PSR ¶ 68). The Bitcoin that Rodriguez transferred to law enforcement originated from some of the cold crypto-currency wallets that had been storing the 10,000 Bitcoin transferred from Crypto Capital in 2018. (PSR ¶ 68). Promptly following the transfer, Rodriguez requested bail, and when the Government did not agree, Rodriguez ceased his efforts to cooperate. (PSR ¶ 68).

Following the transfer from Rodriguez, the Government discovered evidence that Rodriguez controlled additional Bitcoin that he had not turned over to law enforcement, contrary to his representation that he had transferred all personal and Airbit Club Bitcoin. In May 2021, while executing a search warrant in California at the residence of Rodriguez's brother, law enforcement found, in a safe in the brother's bedroom, paper Bitcoin wallets that the brother disclosed had been provided to him by Rodriguez and came from "the office" in Guatemala. (PSR ¶ 69). A web browser window on the brother's computer showed an additional wallet containing Bitcoin that the brother indicated also belonged to Rodriguez. (PSR ¶ 69). Law enforcement further recovered evidence of Bitcoin transfers worth millions of dollars that took place after Rodriguez's efforts to cooperate. (PSR ¶ 69).

On October 25, 2022, two attorneys in Guatemala associated with Master Group (the "Master Group Attorneys") voluntarily transferred to law enforcement approximately 2,500 Bitcoin and 5,500 Bitcoin cash, worth approximately $69 million and $630,000, respectively, at the time the Presentence Report was prepared. (PSR ¶ 70). During the video meeting to coordinate the transfer, the Master Group Attorneys displayed on the screen what appeared to be paper cryptocurrency wallets. (PSR ¶ 70). The Bitcoin and Bitcoin cash that the Master Group Attorneys transferred to law enforcement originated from some of the cold cryptocurrency wallets that had been storing the 10,000 Bitcoin transferred from Crypto Capital in 2018. (PSR ¶ 70).

During the pendency of this case, multiple transfers were made from the cold cryptocurrency wallets storing the 10,000 Bitcoin, including in the days leading up to the transfer on October 25, 2022. (PSR ¶ 71). As of October 25, 2022, the cold cryptocurrency wallets were empty, and law enforcement has been unable to locate and recover the remaining approximately 6,177 of the 10,000 Bitcoin, worth approximately $170 million at the time the Presentence Report was prepared and approximately $164 million at the time of Rodriguez's sentencing. (PSR ¶ 71; A. 163).

### B. The Plea Agreement and the Guilty Plea

The parties negotiated a plea agreement (the "Plea Agreement") under which the Government agreed to accept a guilty plea from Rodriguez to Count One of the Indictment and to dismiss the remaining counts.

(Add. 1). The Plea Agreement contained a stipulation between the parties regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to Rodriguez's offense. The parties agreed that Rodriguez's offense level was 36 based, in part, on the parties' stipulation that a 22-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(L) applied "because the loss was more than $25,000,000 but less than $65,000,000" (the "Stipulated Guidelines Loss Range"). (Add. 2). The Plea Agreement further specified that Rodriguez was in Criminal History Category I, and that his Guidelines range was therefore 188 to 235 months' imprisonment (the "Stipulated Guidelines Range"). (Add. 3).

The Plea Agreement authorized the parties to "present to . . . the Court any facts relevant to sentencing" and "make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." (Add. 3).

The Plea Agreement provided that Rodriguez "hereby admits the forfeiture allegation with respect to Count One . . . and agrees to forfeit to the United States . . . (i) a sum of money equal to $65,000,000 in United States currency, representing proceeds traceable to the commission of said offense (the 'Money Judgment'); and (ii) all right, title and interest of the defendant in the following specific property (the 'Specific Property'): all property listed in the Consent Order of Forfeiture." (Add. 1-2; *see also* A. 45-66).

In the Plea Agreement, Rodriguez agreed that he would "not file a direct appeal; nor bring a collateral challenge . . . of any sentence within or below the Stipulated Guidelines Range of 188 to 235 months' imprisonment." (Add. 4). Rodriguez further "agree[d] not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum," "any fine that is less than or equal to $400,000," "any forfeiture amount that is less than or equal to $65,000,000," the forfeiture of the Specific Property, or "any special assessment that is less than or equal to $100." (Add. 4).

The Plea Agreement contained an integration clause stating:

> Apart from any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

(Add. 6).

On March 8, 2023, during a plea proceeding that Rodriguez does not challenge on appeal, Rodriguez pleaded guilty to Count One of the Indictment pursuant to the Plea Agreement. (A. 67-83). During the plea proceeding, Judge Daniels specifically directed

Rodriguez's attention to the Plea Agreement's appeal waiver provision and confirmed that Rodriguez understood it:

> THE COURT: . . . Do you understand that one of the expressed provisions of this plea agreement with the government is that you're giving up, or waiving your right, to file any appeal of the conviction or sentence in this case if the sentence is within or below the stipulated guideline range that's laid out in this agreement? Do you understand that?
>
> THE DEFENDANT: Yes, I understand.

(A. 81).

The District Court entered the Consent Order of Forfeiture, referenced in the Plea Agreement, at the time of Rodriguez's guilty plea. (A. 82, 45-66). As set forth in the Plea Agreement, the Consent Order of Forfeiture included a $65 million Money Judgment and items of Specific Property, including the cryptocurrency that the Government recovered and seized as part of its investigation. (Add. 2-3; A. 45-66, 82).

### C. The Sentencing Proceedings

#### 1. The Presentence Report and the Parties' Sentencing Submissions

In advance of Rodriguez's sentencing, the Probation Office prepared the Presentence Report, which included the same Guidelines calculation as that set forth in the Plea Agreement, resulting in a Guidelines

range of 188 to 235 months' imprisonment. (PSR ¶¶ 89-104, 150). The Probation Office recommended a sentence of 160 months' imprisonment based on "the extensive loss amount in this case, the length, extent and sophistication of the fraud, the financial harm caused to victims, and the defendant's leadership role." (PSR at 46).

Rodriguez filed a sentencing submission seeking a sentence of 48 months' imprisonment and one year of home confinement as part of supervised release. (A. 93-130). Rodriguez agreed that the Guidelines range was 188 to 235 months' imprisonment but argued that a substantial downward variance was appropriate based on several factors, including, principally, that he was "extremely remorseful" and had "voluntarily turned over to the government over $70 million worth of Bitcoin, as well as agreed to forfeit property valued at more than $100 million—an amount many times larger than the collective loss of all the victims of the case." (A. 94).[5] Rodriguez argued that his actions in "freely and voluntarily provid[ing] $70 million in value so that any and all members and/or victims could be made whole . . . distinguish[ed] him from virtually any other sentenced cyber-fraud defendant, thereby justifying a sentence of 48 months and

---

[5] The 1,323 Bitcoin that Rodriguez transferred to law enforcement in January 2021 was worth approximately $36 million as of the time the Presentence Report was prepared. (PSR ¶ 68). The Government does not know the basis of Rodriguez's $70 million valuation.

one year of home confinement." (A. 113; *see also* A. 123 ("With utmost sincerity and a deep sense of remorse . . . I voluntarily surrendered approximately 70 million dollars")). Anticipating the Government's likely response that "that while [Rodriguez] provided $70 million, he failed to turn over all proceeds of the offense," Rodriguez argued "the additional funds provided by the [Master Group Attorneys] [were] irrelevant when considering an appropriate sentence," because Rodriguez had agreed to forfeit Specific Property worth more than $65 million. (A. 112-13).[6] Rodriguez also claimed that he was "someone who has now lost everything" and that "his and his family's financial future [was] severely compromised." (A. 101, 107). Finally, Rodriguez argued that a downward variance was appropriate based on other factors, including his claim that "the maximum, collective out-of-pocket loss of all victims [was] approximately $2.4 million" and the difficult conditions of pretrial confinement he endured during the COVID-19 pandemic. (A. 94).

In its sentencing submission, the Government agreed with the Guidelines calculation in the Presentence Report and the parties' Plea Agreement, resulting in a Guidelines range of 188 to 235 months' imprisonment. (A. 155). The Government advocated for a below-Guidelines sentence of "at least 160 months'

---

6 Rodriguez's argument in this regard overlooked that the cryptocurrency that the Master Group Attorneys transferred to the Government in October 2022 was among the items of Specific Property included in the Consent Order of Forfeiture. (A. 60-61).

imprisonment," a sentence the Government deemed "sufficient but not greater than necessary to serve the purposes of sentencing," based on the seriousness of Rodriguez's crime, the "incredible harm" that it inflicted on numerous victims, and the need to provide just punishment, promote respect for the law, protect the public, and achieve specific and general deterrence. (A. 135, 166, 171). The Government identified eight aggravating factors as part of its Section 3553(a) analysis: the duration of Rodriguez's criminal conduct, the extensive scope of the fraud, the significant harm Rodriguez caused to victims, Rodriguez's role as co-founder and leader of the Scheme, Rodriguez's participation in other multilevel marketing fraud schemes, Rodriguez's sophisticated money laundering, Rodriguez's "less than truthful plea allocution," and Rodriguez's retention of substantial fraud proceeds. (A. 156-57). The Government's sentencing submission enclosed impact statements from more than 500 victims. (*See* A. 135, 158 n.3). The Government acknowledged that Rodriguez voluntarily turned over 1,323 Bitcoin, worth $36 million, to law enforcement (A. 152-53) but argued that his retention of other proceeds of the Scheme, worth $164 million at the time of sentencing, warranted consideration under Section 3553(a):

> There is also a need for substantial specific deterrence in this case to send a message to Rodriguez that crime does not pay. Rodriguez earned enormous profits from his criminal conduct and has succeeded in hiding a fortune. As described above, in 2018, Rodriguez transferred 10,000 Bitcoin in Airbit Club proceeds

> from Crypto Capital to cold cryptocurrency paper wallets held in Guatemala he controlled. Although he gave a portion of that Bitcoin to the Government, since his arrest, he has kept more than half of it, currently worth approximately $164 million. Rodriguez, working with others, during the pendency of this case emptied the cryptocurrency paper wallets, dispersing the Bitcoin and hiding it beyond the Government's reach. Although the Government sought to investigate and locate the funds, the Government will not be able to forfeit the funds to deprive Rodriguez of all his crime proceeds. Rodriguez should be required to serve a sentence of at least 160 months' imprisonment before he is permitted to enjoy his ill-gotten gains, to send a message to Rodriguez and others who may be considering engaging in similar conduct that these crimes carry a meaningful consequence.

(A. 163-64; *see also* A. 167 ("[T]he continued concealment of his crime proceeds since his arrest further demonstrate[s] that Rodriguez's risk of recidivating remains high.")). The Government also disagreed with Rodriguez's claim that the victims' losses were "only $2.4 million," pointing out, among other things, that Rodriguez's analysis included only U.S. victims and that the Stipulated Guidelines Loss Range was $25 million to $65 million. (A. 168-69).

### 2. The Sentencing

On September 26, 2023, Rodriguez appeared before Judge Daniels for sentencing. (A. 172-240). At the outset of the proceeding, Rodriguez confirmed that he had no objections to the Presentence Report other than those that already had been addressed by the Probation Office. (A. 173). Judge Daniels then heard from the parties regarding the appropriate sentence under 18 U.S.C. § 3553(a). (A. 173-234).

The Government reiterated its recommendation for a below-Guidelines sentence of at least 160 months' imprisonment. (A. 174). The Government argued that various aggravating factors warranted this sentence pursuant to Section 3553(a), including the "extensive scope of the scheme," Rodriguez's "role as co-founder" of Airbit Club, Rodriguez's "sophisticated money laundering scheme," the "extensive harm caused to victims," Rodriguez's previous participation in two other multilevel marketing Ponzi schemes, and the fact that Rodriguez had "successfully hidden a portion of the crime proceeds," consisting of the balance of the 10,000 Bitcoin that law enforcement had been unable to recover. (A. 174-76; *see also* A. 223-27). The Government further emphasized the need for general deterrence given the proliferation of "copycat-type . . . multi-level marketing crypto scams." (A. 177). In nonetheless seeking a below-Guidelines sentence, the Government recognized that the Guidelines range was "very high" and acknowledged that there were mitigating factors, including that Rodriguez "turned over a valuable amount of Bitcoin, and he has pled guilty in this case." (A. 178-79; *see also* A. 228). In response to Judge

Daniels's question whether Rodriguez had been "forthcoming with regard to the full extent of the scheme and the assets that were obtained by it," the Government explained that Rodriguez had not been forthcoming because "he turned over a substantial amount of Bitcoin earlier in this case . . . claiming it was all the Bitcoin he had and all of the Airbit Club Bitcoin," but "there [were] significantly more assets that the defendant maintained access to after that point." (A. 184-85). The Government went on to describe the cryptocurrency recovered from Rodriguez's brother and the cryptocurrency that the Master Group Attorneys transferred to the Government in October 2022. (A. 185-86).

Rodriguez's counsel emphasized that Rodriguez was loved and respected by his family and urged Judge Daniels to consider the difficult conditions that Rodriguez endured during pretrial detention. (A. 188, 202-05). Counsel argued that a sentence of 48 months was appropriate given comparable cases, that Rodriguez has "been nothing but remorseful," and that the loss amount was only $2.4 million. (A. 188, 190-92, 197-99). Counsel again emphasized that Rodriguez voluntarily provided "1200 Bitcoin," worth $70 million, to the Government and agreed to forfeit assets worth at least $100 million. (A. 189).[7] With respect to the

[7] In response to Judge Daniels's inquiry about the amount of funds recovered as part of the investigation, the Government reported that the then-current value of the Specific Property that the Government was seeking to forfeit was "around $100 million," although it "worth much less during parts of the scheme, a

Government's argument that Rodriguez had retained substantial additional proceeds of the Scheme, counsel argued that "[t]hat doesn't exist. [Rodriguez] just doesn't have that." (A. 192; *see also* A. 201 (arguing there was "no evidence" that "there's this other money out there, and [Rodriguez] must have it")). Counsel further argued:

> In fact, the government has agreed in the plea agreement that the intended los[s] and the forfeiture is maxed out at $65 million. If they now have over $100 million, what is it that [they] think [they are] looking for? They can't by definition, according to the government, according to the plea agreement, they can't be seeking more money.

(A. 215).

The Government made clear that it was not seeking additional forfeiture. (*See* A. 233). The Government also explained that it was not arguing that victims suffered losses greater than $65 million—only that Rodriguez had retained additional profits from the Scheme, which have appreciated in value and warranted consideration under Section 3553(a):

> There is a big difference, as your Honor knows, between restitution and loss for victims and forfeiture and profits to the defendant.

---

number of years ago" because "the value of Bitcoin fluctuates over time." (A. 182).

So when we are talking about the value of Bitcoin, we are talking about hundreds and millions of dollars. We are talking about profits to the defendant. It doesn't necessarily equate with a dollar value that victims have put in. Because what the defendant and his codefendants did was turn much of the investments that victims made, often in cash, . . . into Bitcoin. And in the interim years, that Bitcoin has become more valuable. So the defendant's profits have increased, but perhaps the loss to the victim is smaller.

But it is an important point that I want to make. That is why the government keeps looking at the value of the assets seized, the value of the Bitcoin, and the number of Bitcoin. Because the defendant shouldn't be permitted to just point to what victims have lost[,] the dollars they put in, it is also relevant the profits the defendant has made and his codefendants have made. That's just a function of the price of Bitcoin has gone up. It is also gone back down somewhat in the interim, but the price fluctuates.

That is one of the reasons why the Ponzi scheme continued for so long. The defendant was pocketing the money, but he was able to keep it going, and his codefendants as well, because the value of the Bitcoin increased. So he could afford for a

> while to pay out Bitcoin as he pleased to victims, to his investors, just enough to keep people investing and just enough to keep the whole thing from collapsing. But I really want to emphasize that it is important to understand the difference between profit versus loss, and profit is a relevant factor for sentencing as well.
>
> That goes as well, your Honor, to specific and general deterrence. The profits the defendant made and the profits that he's keeping. You know, the fact that the defendant gets to walk away with money, with Bitcoin, points to a greater need for specific deterrence. It also points to a greater need for general deterrence, to show others—as I said, there are many of these copycat multi-level marketing crypto schemes—to show them that crime doesn't pay. You can't just get to serve a few years in jail and get to keep a lot of the money, and it balances out and it's worth it. That is not message that this Court should be sending.

(A. 225-27).

Rodriguez's counsel agreed that "loss to the victims and how much [Rodriguez] gained" were "two separate factors" but nonetheless contended that the Government's argument about additional profits "very well might have" violated the Plea Agreement's provision

regarding the $65 million Money Judgment. (A. 230).[8] In response, the Government noted that the Plea Agreement did not contain any stipulation regarding Rodriguez's profits from the Scheme:

> The language in the plea agreement obviously speaks for itself, but what the plea agreement says is that the parties have agreed to a forfeiture, which includes a money judgment amount of $65 million, plus numerous items of specific property. We have also agreed to a foreseeable intended loss amount of maximum $65 million pursuant to the guidelines, 2B1.1.
>
> We have not agreed, pursuant to the terms of the plea agreement, as to what the defendant's profits have been. Forfeiture represents profits, but we have not —that's what we are allowed to forfeit, are proceeds traceable to the offense. We have not agreed to a maximum profit amount for this defendant. All we have agreed is that we are not going to seek forfeiture beyond the $65 million money

[8] Rodriguez did not seek any remedy for the purported breach below other than to ask Judge Daniels to "heavily consider" his arguments that "the government cannot stand here today and tell you it's more than $65 million," and that because Rodriguez had already agreed to forfeit "a hundred million," there was "nothing else to get." (A. 232).

> judgment and the specific property. And that is it.

(A. 233).

Judge Daniels then afforded Rodriguez an opportunity to address the District Court. (A. 234-36). Rodriguez stated he was remorseful and described the challenges of his incarceration. (A. 234-36). Rodriguez reminded Judge Daniels that he had "voluntarily surrendered around 70 million worth of cryptocurrency," and that his "goal was always to address the situation, assist victims, and repay any debt." (A. 236).

Judge Daniels adopted the factual recitation in the Presentence Report and agreed with the Guidelines calculation set forth therein. (A. 236). Turning to the appropriate sentence under Section 3553(a), Judge Daniels noted that he had "reviewed all the written submissions and considered the arguments made by the parties" at the sentencing hearing and "considered all the factors in 18 U.S.C. Section 3553(a) relevant to sentence." (A. 237). In determining the appropriate sentence, Judge Daniels explained that there were mitigating factors that warranted a sentence below the Guidelines range, but that "the nature of this offense and all the factors considered" nonetheless warranted a "substantial sentence":

> I believe that the defendant deserves some mitigating credit for his postarrest conduct and the conditions of confinement and to the extent that he has assisted in recovering a portion of victims' funds and acceptance of responsibility for

> his crime represented by his guilty plea and the moneys that were turned over to the government.
>
> However, I believe that his role in this offense and the extent of the fraud warrant a substantial sentence and that this was a sophisticated scheme with real and numerous victims and that both general and specific deterrence and appropriate punishment warrant a substantial sentence.

(A. 237). Based on these considerations, Judge Daniels imposed a below-Guidelines sentence of 144 months' imprisonment, to be followed by three years' supervised release, which he concluded was sufficient but "not greater than what is necessary" to comply with the purposes of sentencing. (A. 237-38). Judge Daniels noted that he had previously entered the Consent Order of Forfeiture. (A. 238). Judge Daniels deferred restitution for 90 days, imposed the mandatory $100 special assessment, and did not impose a fine. (A. 238).[9] On the Government's motion, Judge Daniels dismissed all open counts against Rodriguez. (A. 240).

The judgment of conviction was entered the next day, and Rodriguez filed a timely notice of appeal. (A. 241-49).

---

[9] On January 8, 2024, on the Government's motion, Judge Daniels entered an order forgoing restitution as impracticable and authorizing the Government to "compensate victims with finally forfeited assets through the remission process." (Dkt. 283).

# ARGUMENT

## POINT I

### Rodriguez's Appeal Should Be Dismissed

On appeal, Rodriguez challenges his sentence and seeks resentencing before a different judge. Rodriguez contends that his appellate waiver is unenforceable because the Government breached the Plea Agreement by arguing at sentencing that Rodriguez "caused loss and retained proceeds of fraud even greater than $65 million." (Br. 1-2; *see* Br. 29-30). Rodriguez is wrong. The Government fully complied with the Plea Agreement. Contrary to Rodriguez's contention, the Government never argued that Rodriguez "caused loss . . . greater than $65 million." (Br. 1-2). Nor did the Government ever argue that a Guidelines range different from the Stipulated Guidelines Range was applicable, or seek to forfeit any money or property other than what was specified in the Plea Agreement. The Government's argument that Rodriguez had retained proceeds of the Scheme worth approximately $164 million at the time of sentencing was supported by the facts in the Presentence Report (PSR ¶¶ 58, 68-71), appropriate under Section 3553(a), responsive to Rodriguez's arguments, and permitted under the Plea Agreement, which contained no stipulation regarding Rodriguez's gain from the Scheme and which authorized the parties to "present to . . . the Court any facts relevant to sentencing" and "make any arguments . . . regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." (Add. 3). The Government did not breach the

Plea Agreement, Rodriguez's appellate waiver is valid and enforceable, and Rodriguez's appeal should be dismissed.

## A. Applicable Law

### 1. Breach of a Plea Agreement

This Court "review[s] interpretations of plea agreements *de novo* and in accordance with principles of contract law." *United States v. Griffin*, 510 F.3d 354, 360 (2d Cir. 2007), *abrogated on other grounds by Puckett v. United States*, 556 U.S. 129 (2009). "To determine whether a plea agreement has been breached," this Court looks "to the reasonable understanding of the parties as to the terms of the agreement." *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002). Because plea agreements "are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain," *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999), this Court "construe[s] plea agreements strictly against the government and do[es] not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness." *United States v. Helm*, 58 F.4th 75, 83 (2d Cir. 2023). Notwithstanding this stringent scrutiny of the Government's compliance with plea agreements, this Court's cases have not "yielded a bright-line rule as to the leeway the government has with respect to what it tells the court while operating under such an agreement." *Griffin*, 510 F.3d at 361. Rather, the circumstances of each case "must be carefully studied in context" to determine whether the Government "reasonably appear[ed] to seek to

influence the court in a manner incompatible with the agreement." *United States v. Amico*, 416 F.3d 163, 167 n.2 (2d Cir. 2005).

A "unilateral understanding [is] insufficient to supplement the terms of the written plea agreement." *In re Altro*, 180 F.3d at 376. "[E]specially where—as here—the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement, a defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach." *Id.*; *accord United States v. Lenoci*, 377 F.3d 246, 258 (2d Cir. 2004).

In general, the remedy for a breach of a plea agreement is to allow the wronged party either to withdraw from the agreement or to insist on specific performance. *See Griffin*, 510 F.3d. at 367; *United States v. Cimino*, 381 F.3d 124, 127-28 (2d Cir. 2004). This Court has recognized an exception to the need to impose such a remedy for so-called *de minimis* breaches that occur when the Government's "violation is so minor that it does not cause the defendant to suffer any meaningful detriment." *United States v. Vaval*, 404 F.3d 144, 155 (2d Cir. 2005). The *de minimis* breach exception applies when the breach caused no real harm "because the defendant's reasonable expectations were fulfilled." *Amico*, 416 F.3d at 167.

### 2. Waiver of Right to Appeal

This Court has repeatedly held that waivers of the right to appeal are typically valid and enforceable. *See,*

*e.g.*, *United States v. Borden*, 16 F.4th 351, 354 (2d Cir. 2021); *United States v. Coston*, 737 F.3d 235, 237 (2d Cir. 2013); *United States v. Riggi*, 649 F.3d 143, 147-48 (2d Cir. 2011). The circumstances in which this Court will decline to enforce a waiver are very limited. *See United States v. Gomez-Perez*, 215 F.3d 315, 319 (2d Cir. 2000) ("The[ ] exceptions to the presumption of the enforceability of a waiver . . . occupy a very circumscribed area of our jurisprudence. Accordingly, we have upheld waiver provisions even in circumstances where the sentence was conceivably imposed in an illegal fashion or in violation of the Guidelines, but yet was still within the range contemplated in the plea agreement."). The exceptions include situations "when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, when the government breached the plea agreement, or when the sentencing court failed to enunciate any rationale for the defendant's sentence." *Id.* The knowing and voluntary nature of the waiver can be established by demonstrating that during the plea hearing, the defendant's attention was drawn to the waiver provision in the plea agreement. *See United States v. DeJesus*, 219 F.3d 117, 121 (2d Cir. 2000).

## B. Discussion

### 1. The Government Did Not Breach the Plea Agreement

Rodriguez argues that the Government breached two provisions of the Plea Agreement: (i) the parties'

Guidelines stipulation providing for a Stipulated Guidelines Loss Range of $25 million to $65 million, and (ii) the forfeiture provision providing that Rodriguez agreed to a money judgment in the amount of $65 million. (*See* Br. 1, 6-7, 16; Add. 1-2). The record clearly shows that the Government complied with these (and all other) provisions of the Plea Agreement. In accordance with the Guidelines stipulation in the Plea Agreement, the Government argued that the loss from Rodriguez's offense was between $25 million and $65 million, and that Rodriguez's Guidelines range was 188 to 235 months' imprisonment. (A. 154-55, 168; *see also* A. 178 (acknowledging the Guidelines Range was 188 to 235 months' imprisonment)). The Presentence Report included the same calculation, and the District Court adopted that calculation at sentencing. (PSR ¶¶ 89-104, 150; A. 236). The Government also complied with the Plea Agreement's forfeiture provision, seeking to forfeit exactly what was referenced in the Plea Agreement: $65 million and the Specific Property. (Add. 1-2; A. 45-66, 233). The District Court entered the Consent Order of Forfeiture that the parties negotiated and did not order any additional forfeiture. (A. 45-66, 238). Because Rodriguez cannot point to any provision of the Plea Agreement that the Government violated, his claim of breach fails.

Rodriguez nonetheless contends the Government breached the Plea Agreement by arguing that Rodriguez "caused loss and retained proceeds of fraud even greater than $65 million." (Br. 1-2). Rodriguez is wrong. As an initial matter, Rodriguez mischaracterizes the Government's argument. Rodriguez has not identified anywhere in the record where the

Government argued that Rodriguez "caused loss . . . even greater than $65 million." (Br. 1-2). The Government in fact made no such argument. Rather, the Government argued, based on facts in the Presentence Report, that the District Court should consider, pursuant to Section 3553(a), that Rodriguez had retained a large portion of his profits from the Scheme, which had appreciated in value based on the price of Bitcoin and were worth approximately $164 million at the time of sentencing. (*See* A. 163-64, 175-76, 223-27).

In both its sentencing submission and its oral remarks to the District Court, the Government specifically tethered its argument about Rodriguez's retained profits from the Scheme to the Section 3553(a) factors, particularly the need to afford specific and general deterrence, arguing that "Rodriguez should be required to serve a sentence of at least 160 months' imprisonment before he is permitted to enjoy his ill-gotten gains, to send a message to Rodriguez and others who may be considering engaging in similar conduct that these crimes carry a meaningful consequence." (A. 163-64; *see also* A. 226-27 ("[T]hat the defendant gets to walk away with money, with Bitcoin, points to a greater need for specific deterrence. It also points to a greater need for general deterrence, to show others . . . that crime doesn't pay. You can't just get to serve a few years in jail and get to keep a lot of the money, and it balances out and it's worth it. That is not message that this Court should be sending.")). The Government's argument, which was supported by the facts in the Presentence Report (PSR ¶¶ 58, 68-71), was proper and permitted under the Plea Agreement, which authorized the parties to "present to . . . the Court any

facts relevant to sentencing" and "make any arguments . . . regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." (Add. 3). *Cf., e.g.*, *United States v. Tokhtakhounov*, 607 F. App'x 8, 11-12 (2d Cir. 2015) (sentencing arguments that defendants were "leaders of the criminal enterprise" and that "the Guidelines as applied in this case understated the seriousness of the offense" were proper under plea agreement that did not provide for a leadership enhancement but permitted Section 3553(a) arguments).

The Government's Section 3553(a) argument regarding Rodriguez's retained illicit proceeds, which was proper standing on its own, was particularly appropriate considering that Rodriguez opened the door to it by repeatedly arguing that his voluntary transfer of Bitcoin to law enforcement was a mitigating factor demonstrating his remorse and warranting an exceedingly lenient sentence. During his plea allocution, Rodriguez stated: "I have already voluntarily provided the government with well over 1,100 Bitcoin—they value at over 70 million—so that any and all victims can be made whole." (A. 81). In his sentencing submission, Rodriguez argued that his actions in "freely and voluntarily provid[ing] $70 million in value so that any and all members and/or victims could be made whole . . . distinguish[ed] him from virtually any other sentenced cyber-fraud defendant, thereby justifying a sentence of 48 months and one year of home confinement." (A. 113). In his personal letter to Judge Daniels, Rodriguez, claiming "utmost sincerity and a deep sense of remorse," again referenced his voluntary surrender of "approximately 70 million dollars worth of

cryptocurrency," which he claimed "underscore[d] [his] genuine intention to ameliorate the harm inflicted upon the victims and to entirely settle any debts." (A. 123). Rodriguez further argued that he was "someone who has now lost everything" and that "his and his family's financial future [was] severely compromised." (A. 101, 107). It was proper for the Government to respond to these arguments by pointing out that while Rodriguez did in fact surrender a substantial amount of Bitcoin to law enforcement, he also retained other Bitcoin, representing proceeds of the Scheme, worth $164 million at the time of his sentencing. (A. 163-64, 175-76, 223-27). The information was relevant to assess the sincerity of Rodriguez's remorse, the significance of Rodriguez's voluntary surrender of 1,323 Bitcoin, and the veracity of Rodriguez's proffered financial status, all factors raised by Rodriguez at sentencing. Indeed, Rodriguez himself anticipated that the Government would respond to his arguments, predicting that the Government would "comment" that "he failed to turn over all proceeds of the offense, as significant funds were provided to the government by [the Master Group Attorneys] in late 2022." (A. 112). The Government did not breach the Plea Agreement by discussing Rodriguez's retained illicit profits in the context of evaluating the Section 3553(a) factors and responding to Rodriguez's arguments for a downward variance. *See, e.g.*, *United States v. Martinez*, 721 F. App'x 75, 77 (2d Cir. 2018) ("[M]erely providing information or evidence in response to any statements by the defendant does not breach the plea agreement." (citing *Griffin*, 510 F.3d at 364)); *United States v. Sehgal*, 480 F. App'x 16, 22 (2d Cir. 2012) (no breach

where the Government's comments "were in response to [defendant's] request for a non-Guidelines sentence"); *Amico*, 416 F.3d at 165-66 (no breach where defendant "opened the door" to the Government's response); *see also United States v. Moschella*, 727 F.3d 888, 892 (9th Cir. 2013) (no breach where "the prosecutor's sentencing arguments were a fair response to Defendant's request for a downward variance"); *United States v. Howard*, 299 F. App'x 885, 887 (11th Cir. 2008) (no breach where the Government's statements were "made only in response to [defendant's] argument that the district court should vary downward").

In claiming that the Government's argument breached the Guidelines stipulation in the Plea Agreement, Rodriguez improperly conflates the concepts of loss to victims and gain to a defendant, repeatedly referring to them together as "loss and gain." (Br. 2, 4, 8, 16, 17, 20-23, 26, 28, 30). As the Guidelines themselves recognize, however, loss and gain are distinct concepts. *See* U.S.S.G. § 2B1.1, comment. (n.3(B)) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."); *see also, e.g.*, *United States v. Romano*, 794 F.3d 317, 338 (2d Cir. 2015). Here, the Stipulated Guidelines Range was based on a "loss" to victims of between $25 million and $65 million. (Add. 2). Contrary to Rodriguez's contention, at no point did the Government argue that Rodriguez "caused loss . . . even greater than $65 million." (Br. 1-2). Instead, the Government consistently stated that the loss from the Scheme was between $25 million and $65 million, as set forth in the Plea Agreement.

(*See, e.g.*, A. 154-55, 168). Indeed, when Rodriguez argued, notwithstanding the Plea Agreement, that "the maximum, collective out-of-pocket loss of all victims [was] approximately $2.4 million" (A. 94; *see also* A. 112, 113 n.3, 191), the Government responded that the Stipulated Guidelines Loss Range was $25 million to $65 million (A. 168). And the Government made clear at sentencing that because the Guidelines range was based on loss to victims, Rodriguez's retained profits from the Scheme did not affect the Guidelines calculation. (*See* A. 225-26). As the Government explained, loss and gain were distinct concepts that diverged in this case in particular "[b]ecause what the defendant and his codefendants did was turn much of the investments that victims made, often in cash, . . . into Bitcoin. And in the interim years, that Bitcoin has become more valuable. So the defendant's profits have increased, but perhaps the loss to the victim is smaller." (A. 225). *Cf. Amico*, 416 F.3d at 166 (no breach where the Government repeatedly stated that "it was not advocating for . . . enhancements" not contemplated in the plea agreement); *Riera*, 298 F.3d at 136 (no breach where the Government "repeatedly told the district court that it had not intended to advocate and was not advocating a departure"). Indeed, Rodriguez himself acknowledged at sentencing that "loss to the victims and how much he gained" were "two separate factors." (A. 230). Rodriguez's contention that the Government breached the Guidelines stipulation in the Plea Agreement by arguing about his retained profits from the Scheme is therefore meritless.

Rodriguez's claim that the Government violated the Plea Agreement's forfeiture provision (Br. 1, 6-7,

16) is similarly meritless. The Plea Agreement provided that Rodriguez "hereby admits the forfeiture allegation with respect to Count One . . . and agrees to forfeit to the United States . . . (i) a sum of money equal to $65,000,000 in United States currency, representing proceeds traceable to the commission of said offense (the 'Money Judgment'); and (ii) all right, title and interest of the defendant in the following specific property (the 'Specific Property'): all property listed in the Consent Order of Forfeiture." (Add. 1-2). Consistent with this provision, the Government submitted the Consent Order of Forfeiture, which the District Court entered at the time of Rodriguez's guilty plea, seeking to forfeit exactly what was described in the Plea Agreement: $65 million and the Specific Property. (A. 45-66, 82). The Government did not seek to forfeit any additional money or property or argue that such additional forfeiture was appropriate. To the contrary, the Government told Judge Daniels that it had agreed not to "seek forfeiture beyond the $65 million money judgment and the specific property." (A. 233).[10] Notwithstanding Rodriguez's attempt to contort the forfeiture provision in the Plea Agreement into a stipulation that his "fraud . . . gain" was "valued at $65 million" (Br. 8), the plain language of the Plea Agreement, as the Government pointed out to the District Court, in fact

---

[10] Because the Government did not seek any additional forfeiture in this case, this Court need not decide whether the Government would have been permitted to do so under the terms of the Plea Agreement, which provided only that "[t]he defendant . . . agrees to forfeit" $65 million and the Specific Property. (Add. 1-2).

contains no stipulation regarding Rodriguez's gain from the Scheme. (*See* A. 233; Add. 1-6). While the Plea Agreement describes the $65 million that Rodriguez "agree[d] to forfeit" as "representing proceeds traceable to the commission of [the] offense" (Add. 1), there is no stipulation that the $65 million represents *all* proceeds of the Scheme. Simply put, nothing about the Plea Agreement's provision that Rodriguez "agree[d] to forfeit" $65 million and the Specific Property precluded the Government from referencing facts in the Presentence Report to argue, under Section 3553(a), that Rodriguez had retained additional profits from the Scheme that had appreciated in value, heightening the need for deterrence. (A. 163-64, 223-27).

Because the Government did not violate any provision of the Plea Agreement, Rodriguez's claim of breach is meritless. To the extent that Rodriguez claims that he formed some unilateral view or understanding about the Government's ability to argue about his gain from the Scheme notwithstanding the absence of any provision on this point in the Plea Agreement, Rodriguez "may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach," particularly where, as here, "the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement." *In re Altro*, 180 F.3d at 376; *see also id.* (A "unilateral understanding [is] insufficient to supplement the terms of the written plea agreement."). (*See* Add. 6 ("No additional understandings, promises, or conditions have been entered into

other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties."); A. 79 (Rodriguez affirming under oath that he had not been "promised anything that's been left out of [the plea] agreement")).

Finally, even assuming, *arguendo*, that the Government's argument about Rodriguez's retained profits from the Scheme breached the Plea Agreement (it did not), the breach was *de minimis*. Although the Government argued that Rodriguez had successfully hidden a large portion of his illicit profits, the Government also acknowledged that there were mitigating factors and consistently advocated for a sentence of at least 160 months, below the Stipulated Guidelines Range, which the Government deemed "sufficient but no greater than necessary to serve the purposes of sentencing." (A. 166, 171, 178-79, 228). *See United States v. Frazier*, 805 F. App'x 15, 18 (2d Cir. 2020) ("[T]o the extent the government breached the plea agreement by advocating for a sentence based on a higher drug quantity, the government still comported with the reasonable understanding and expectations of the defendant as to the sentence for which he had bargained because the government continued to advocate for a sentence . . . within the range provided for by the plea agreement. Thus, [defendant] suffered no meaningful detriment, rendering the breach technical and the remedy he seeks unwarranted."). Moreover, Judge Daniels necessarily rejected any argument advocating a higher Guidelines loss range when he adopted the Guidelines calculation set forth in the Plea Agreement. (A. 236). Similarly, Judge Daniels necessarily rejected any argument advocating for higher forfeiture

by entering only the Consent Forfeiture Order, which covered exactly what was referenced in the Plea Agreement: $65 million and the Specific Property. (A. 45-66). And Judge Daniels imposed a sentence substantially below the Stipulated Guidelines Range and lower than the sentence recommended by the Probation Office and the Government, crediting Rodriguez's argument that his efforts in turning over a substantial amount of Bitcoin to law enforcement were a significant mitigating factor. (A. 237 ("I believe that the defendant deserves some mitigating credit for his postarrest conduct and the conditions of confinement and to the extent that he has assisted in recovering a portion of victims' funds and acceptance of responsibility for his crime represented by his guilty plea and the moneys that were turned over to the government.")). On these facts, Rodriguez's sentence "comport[ed] with [his] reasonable understanding and expectations . . . as to the sentence for which he had bargained," *Vaval*, 404 F.3d at 156, and any breach does not require the remedy that Rodriguez seeks.

### 2. Rodriguez Knowingly and Voluntarily Waived His Right to Appeal

During his plea proceeding, which Rodriguez does not challenge on appeal, Rodriguez affirmed his understanding that he was waiving his right to appeal a sentence of 235 months' imprisonment or less. (A. 81). Judge Daniels ensured that Rodriguez was aware of the waiver in the Plea Agreement, and had Rodriguez confirm under oath that he understood the appeal waiver. (A. 81). Because Rodriguez's waiver was knowing and voluntary, and because Judge Daniels

sentenced Rodriguez to a term of 144 months' imprisonment, Rodriguez has waived any challenge to his sentence and his appeal should be dismissed.

Nothing in this case implicates the recognized exceptions to the enforcement of appeal waivers. As discussed above, the Government did not breach the Plea Agreement. *See* Point I.B.1 *supra*. Judge Daniels sentenced Rodriguez substantially below the Stipulated Guidelines Range. To consider issues beyond the enforceability of the appellate waiver would undermine the plea bargaining process, the benefits of which have been long recognized by this Court:

> In no circumstance . . . may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy would render the plea bargaining process and the resulting agreement meaningless.

*United States v. Salcido-Contreras*, 990 F.2d 51, 53 (2d Cir. 1993).

## POINT II

### Rodriguez's Sentence Was Procedurally and Substantively Reasonable

Rodriguez argues that "any consideration [by the District Court] of the government's advocacy on loss and gain in excess of the plea agreement" rendered Rodriguez's sentence procedurally and substantively

unreasonable. (Br. 26-28). Rodriguez's argument is meritless. His below-Guidelines sentence was procedurally and substantively reasonable.

### A. Applicable Law

This Court's "review of criminal sentences includes both procedural and substantive components and amounts to review for abuse of discretion." *United States v. McIntosh*, 753 F.3d 388, 393-94 (2d Cir. 2014). "The procedural inquiry focuses primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a), while the substantive inquiry assesses the length of the sentence imposed in light of the § 3553(a) factors." *United States v. Castillo*, 896 F.3d 141, 148 (2d Cir. 2018).

"Procedural error occurs in situations where, for instance, the district court miscalculates the Guidelines; treats them as mandatory; does not adequately explain the sentence imposed; does not properly consider the § 3553(a) factors; bases its sentence on clearly erroneous facts; or deviates from the Guidelines without explanation." *McIntosh*, 753 F.3d at 394; *see also Gall v. United States*, 552 U.S. 38, 51 (2007). Although district courts must consider the Section 3553(a) factors in imposing sentence, there is "no requirement that the court mention the required factors, much less explain how each factor affected the court's decision." *United States v. Banks*, 464 F.3d 184, 190 (2d Cir. 2006). This Court "entertain[s] a strong presumption" that the sentencing judge has "faithfully discharged" his duty to consider the Section 3553(a) factors and the

arguments bearing on those factors "in the absence of record evidence suggesting otherwise." *United States v. Fernandez*, 443 F.3d 19, 29-30 (2d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007). This Court does not require either "robotic incantations that the district court has considered each of the § 3553(a) factors" or "specific responses to points argued by counsel in connection with sentencing." *United States v. Wagner-Dano*, 679 F.3d 83, 89 (2d Cir. 2012).

"A district court's factual findings at sentencing need be supported only by a preponderance of the evidence, and such findings may be overturned only if they are clearly erroneous." *United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015). It is well established that "a sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004). In reviewing a district court's factual findings, this Court "must view the evidence in the light most favorable to the government." *United States v. Gasperini*, 894 F.3d 482, 485 (2d Cir. 2018).

If there was no procedural error, the Court should "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 552 U.S. at 51. A defendant arguing substantive unreasonableness "bears a heavy burden because [appellate] review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). Under this form of review, this Court must "take into account

the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc).

When applying this deferential standard of review, this Court "will not substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," and will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Perez-Frias*, 636 F.3d 39, 42 (2d Cir. 2011). This Court also bears in mind that a sentencing judge may take into consideration his "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). "That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness." *Id.*

"The particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the sentencing judge[.]" *Broxmeyer*, 699 F.3d at 289. "Generally, if the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, [this Court] will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor." *United States v. Pope*, 554 F.3d 240, 246-47 (2d Cir.

2009). The weight that the district court puts on a particular factor need not be the weight that this Court would give the factor, as long as "the factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances in the case." *Cavera*, 550 F.3d at 191.

This Court has observed that the deferential standard it applies when reviewing a sentence for substantive reasonableness is comparable to the standards it applies when considering whether a jury's verdict constitutes a "manifest injustice" or whether state actors have engaged in conduct that shocks the conscience. *United States v. Rigas*, 583 F.3d 108, 122-23 (2d Cir. 2009). Like those standards, appellate review for substantive reasonableness "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *Id.* at 123. A below-Guidelines sentence rarely will be deemed substantively unreasonable. *United States v. Messina*, 806 F.3d 55, 66 (2d Cir. 2015).

### B. Discussion

Rodriguez argues that the District Court's "consideration of the government's advocacy on loss and gain in excess of the plea agreement served to violate Rodriguez's right as a matter of due process to be sentenced on accurate information and rendered sentencing procedurally unreasonable." (Br. 26). As an initial matter, this argument fails because, as explained

above, *see* Point I.B.1 *supra*, the Government did not advocate for any loss or gain “in excess of the plea agreement.” (Br. 26).

To the extent that Rodriguez is arguing that there was no factual support for the Government’s contention that Rodriguez retained proceeds of the Scheme worth more than $65 million, and that therefore the District Court sentenced Rodriguez based on “clearly erroneous facts” (Br. 26), this argument is without merit. The Government’s contention was amply supported by the undisputed facts in the Presentence Report, namely that: (i) Rodriguez and Dos Santos “withdrew 10,000 Bitcoin from Crypto Capital in 2018 that were Airbit Club proceeds”; (ii) Rodriguez “stored the 10,000 Bitcoin in multiple paper wallets . . . in a safe in Guatemala”;[11] (iii) in January 2021, after his arrest, Rodriguez, from jail, caused approximately 1,323 of the 10,000 Bitcoin to be transferred to the Government; (iv) notwithstanding Rodriguez’s claim that he had transferred all Airbit Club and personal Bitcoin to law enforcement, in May 2021, while executing a search warrant at Rodriguez’s brother’s residence, law enforcement recovered evidence of additional Bitcoin that belonged to Rodriguez and evidence of Bitcoin transfers worth millions of dollars that took place after Rodriguez’s efforts to cooperate; (v) in October 2022,

---

[11] The Government proffered at sentencing that Dos Santos, who was a government cooperator, witnessed Rodriguez create the wallets at an office in Guatemala used by Master Group, the company Rodriguez used to launder Airbit Club proceeds. (A. 222-23).

the Government recovered an additional approximately 2,500 of the 10,000 Bitcoin from two attorneys associated with Rodriguez; and (vi) the remaining approximately 6,177 Bitcoin, "worth approximately $170 million," had been transferred out of the cold cryptocurrency wallets controlled by Rodriguez and law enforcement had been unable to recover them. (PSR ¶¶ 58, 68-71).[12] These facts amply established, by a preponderance of the evidence, that Rodriguez had retained proceeds of the Scheme consisting of the balance of the 10,000 Bitcoin. *See Gaskin*, 364 F.3d at 464 ("[A] sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom.").

Finally, to the extent that Rodriguez is suggesting that his sentence is procedurally unreasonable because the District Court failed to properly consider his

---

[12] Rodriguez did not dispute any of these facts below but disagreed that they established that Rodriguez had retained proceeds of the Scheme, arguing that he was not involved in the Bitcoin transactions that took place after his efforts to cooperate. (*See* PSR at 41-42 (commenting on paragraphs 64, 67, 69, 71); A. 113 (not disputing the "additional funds provided by the AirBit Club attorneys" but describing them as "irrelevant") A. 192 (claiming "that doesn't exist" and "he just doesn't have that" in response to the argument that Rodriguez had retained Airbit Club proceeds); A. 201 (arguing there was "no evidence" that "there's this other money out there, and [Rodriguez] must have it")).

arguments at sentencing (*see, e.g.*, Br. 27 (suggesting the District Court gave "short shrift to Rodriguez's surrender of millions more dollars than he illegally obtained")), that claim is also without merit. Because Rodriguez did not raise this argument below, it is reviewable only for plain error. *See United States v. Alvarado*, 720 F.3d 153, 157 (2d Cir. 2013) (per curiam); *United States v. Bonilla*, 618 F.3d 102, 111 (2d Cir. 2010). There was no error, let alone plain error. This Court "entertain[s] a strong presumption" that a sentencing judge has "faithfully discharged" his duty to consider the Section 3553(a) factors and the arguments bearing on those factors "in the absence of record evidence suggesting otherwise," *Fernandez*, 443 F.3d at 29-30, and does not require either "robotic incantations" or "specific responses to points argued by counsel," *Wagner-Dano*, 679 F.3d at 89. Rodriguez points to nothing in the record to undermine this presumption here. To the contrary, prior to imposing sentence, Judge Daniels expressly noted that he had "reviewed all the written submissions and considered the arguments made by the parties today" and "all the factors in 18 U.S.C. Section 3553(a) relevant to sentence." (A. 237). *See Bonilla*, 618 F.3d at 111 (sentence is procedurally reasonable where district court used substantially identical language); *Fernandez*, 443 F.3d at 29 (presumption that sentencing judge considered parties' arguments "is especially forceful when . . . the sentencing judge makes abundantly clear that she has read the relevant submissions and that she has considered the § 3553(a) factors"). Judge Daniels also expressly addressed, and credited, several of Rodriguez's mitigation arguments. In particular, contrary to Rodriguez's suggestion that

the District Court gave "short shrift to Rodriguez's surrender of millions [of dollars]" (Br. 27), Judge Daniels specifically credited Rodriguez's transfer of Bitcoin to law enforcement in determining that a substantial downward variance from the Guidelines range was appropriate. (*See* A. 237). *See United States v. DiRose*, 586 F. App'x 808, 810 (2d Cir. 2014) (discussion of relevant issues at sentencing "reinforces the presumption that the district court took all of the required factors into account"). At a minimum, on this record, Rodriguez has not so clearly rebutted the "strong presumption" that the District Court considered all relevant factors and arguments, *Fernandez*, 443 F.3d at 33, as to have shown plain error.

Rodriguez's argument that his below-Guidelines sentence was substantively unreasonable (Br. 26-28) similarly fails. Rodriguez complains that "[r]ather than address the breach, and despite an especially distinctive mix of mitigating factors that compellingly supported Appellant's recommendation of a sentence of 48 months, the district judge imposed a sentence of 144 months, almost twice the greatest sentence the judge had ever imposed for a nontrial and nonviolent defendant." (Br. 4). But the record shows that Judge Daniels considered the mitigating factors that Rodriguez raises on appeal and credited several of them in determining the appropriate sentence. (*See* A. 237). At bottom, Rodriguez's complaint is that Judge Daniels did not assign sufficient weight to the mitigating factors he claimed, or applied too much weight to certain aggravating factors. But "[t]he particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the

sentencing judge." *Broxmeyer*, 699 F.3d at 289. Judge Daniels carefully considered the Section 3553(a) factors and the arguments of the parties and ultimately determined that a below-Guidelines sentence of 144 months' imprisonment was warranted. The District Court did not abuse its substantial discretion in doing so, and Rodriguez's sentence therefore should be affirmed.

## POINT III

### This Court Should Not Remand for Resentencing Based on Amendment 821 to the Guidelines

Rodriguez argues that this Court should remand this case for resentencing in light of Amendment 821 to the Guidelines. (Br. 30-31). Amendment 821 went in effect on November 1, 2023, after Rodriguez pleaded guilty and was sentenced, and revised the Guidelines to include a two-level reduction to the offense level for defendants who have no criminal history points and satisfy certain enumerated criteria. *See* U.S.S.G. § 4C1.1. Rodriguez's argument fails for several reasons.

First, because Rodriguez did not raise this argument below, it is reviewable only for plain error. *See United States v. Jones*, 878 F.3d 10, 14-15 (2d Cir. 2017). Rodriguez cannot show that Judge Daniels erred, let alone plainly erred, in calculating his Guidelines range, because the new amendment was not in effect when Judge Daniels sentenced him in September 2023, and, absent *Ex Post Facto* Clause concerns not at issue here, "a sentencing court must apply the version of the Guidelines in effect on the date of the

defendant's sentencing." *United States v. Kilkenny*, 493 F.3d 122, 126 (2d Cir. 2007). Moreover, even if the amendment were in effect at the time of Rodriguez's sentencing, it would not affect his Guidelines range. Under the amendment, a defendant with no criminal history points is eligible for a two-level offense level reduction only if, among other things, he "did not receive an adjustment under § 3B1.1 (Aggravating Role)." U.S.S.G. § 4C1.1(a)(10). Because Rodriguez, as a co-founder and leader of Airbit Club, received a four-level aggravating role adjustment to his offense level (*see* Add. 2; PSR ¶ 95; A. 236), he does not qualify for the two-level reduction provided by Section 4C1.1.

Finally, this Court "may not, in the first instance, apply post-sentence amendments that embody a substantive change to the Guidelines." *United States v. Jesurum*, 819 F.3d 667, 672 (2d Cir. 2016). Amendment 821 is a substantive change to the Guidelines because it reduces the offense level. *See United States v. Major*, No. 23-6166-CR, 2024 WL 1404577, at *3 (2d Cir. Apr. 2, 2024) ("[W]hen an amendment changes the way the Guidelines are calculated, the amendment is a substantive change rather than a clarification." (citing cases)). Accordingly, Rodriguez "must instead direct any request for relief under [the amendment] to the district court in the first instance." *Jesurum*, 819 F.3d at 673.[13]

---

[13] The Sentencing Commission made the amendment retroactive, thereby authorizing eligible defendants to seek a discretionary sentence reduction under 18 U.S.C. § 3582(c)(2). *See* U.S.S.G. amend. 825;

## CONCLUSION

**Rodriguez's appeal should be dismissed or, in the alternative, the judgment of conviction should be affirmed.**

Dated: New York, New York
April 22, 2024

Respectfully submitted,

DAMIAN WILLIAMS,
*United States Attorney for the Southern District of New York, Attorney for the United States of America.*

KIERSTEN A. FLETCHER,
SAMUEL RAYMOND,
CECILIA VOGEL,
OLGA I. ZVEROVICH,
*Assistant United States Attorneys, Of Counsel.*

---

U.S.S.G. § 1B1.10. Therefore, even without a remand by this Court, Rodriguez can seek consideration of that retroactive amendment by filing a motion under Section 3582(c)(2) in the district court.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 11,855 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the Southern District of New York*

By: OLGA I. ZVEROVICH,
*Assistant United States Attorney*

# ADDENDUM

# Add. 1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 2, 2023

**BY EMAIL**

Peter Katz, Esq.
Law Offices of Peter Katz, LLC
116 Village Blvd., 2nd Floor
Princeton, NJ 08540

**Re:** ***United States v. Pablo Renato Rodriguez*, S1 20 Cr. 398 (GBD)**

Dear Mr. Katz:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Pablo Renato Rodriguez ("the defendant") to Count One of the above-referenced superseding Indictment. Count One charges the defendant with conspiracy to commit wire fraud in connection with Airbit Club, in violation of Title 18, United States Code, Section 1349, and carries a maximum term of imprisonment of twenty years, a maximum term of supervised release of three years, a maximum fine, pursuant to 18 U.S.C. § 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment. In addition to the foregoing, the Court must order restitution as specified below.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for participating in a conspiracy to commit wire fraud in connection with the promotion and operation of Airbit Club, as charged in Count One of the superseding Indictment, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Count(s) against the defendant. The defendant agrees that with respect to any and all dismissed charges the defendant is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

The defendant hereby admits the forfeiture allegation with respect to Count One of the superseding Indictment and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c): (i) a sum of money equal to $65,000,000 in United States currency, representing proceeds traceable to the commission of said offense (the "Money Judgment"); and (ii) all right, title and interest of the

# Add. 2



defendant in the following specific property (the "Specific Property"): all property listed in the Consent Order of Forfeiture annexed hereto as Exhibit A. The defendant agrees that the defendant will not file a claim or a petition for remission or mitigation in any forfeiture proceeding involving the Specific Property and will not cause or assist anyone else in doing so. The defendant also agrees to take all necessary steps to pass clear title to the Specific Property to the United States, including, but not limited to, the execution of all necessary documentation. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit A and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

The defendant further agrees to make restitution in an amount ordered by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A. Offense Level

1. The November 1, 2021 Guidelines Manual applies.

2. Pursuant to U.S.S.G. § 2X1.1(a), the applicable Guideline to Count One is U.S.S.G. § 2B1.1.

3. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven.

4. Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), the offense level is increased by 22 levels because the loss was more than $25,000,000 but less than $65,000,000.

5. Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), the offense level is increased by 4 levels because the offense resulted in substantial financial hardship to five or more victims.

6. Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), the offense level is increased by 2 levels because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, and a substantial part of the fraudulent scheme was committed from outside the United States.

7. Pursuant to U.S.S.G. § 3B1.1, the offense level is increased by 4 levels because the defendant was an organizer or leader in Airbit Club and the criminal activity involved five or more participants or was otherwise extensive.

8. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous

# Add. 3



sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 36.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant currently has no criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 188 to 235 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 36, the applicable fine range is $40,000 to $400,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an

# Add. 4



enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that the defendant's entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw the defendant's plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241, of any sentence within or below the Stipulated Guidelines Range of 188 to 235 months' imprisonment, and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum. The defendant agrees not to appeal or bring a collateral challenge of any fine that is less than or equal to $400,000, and the Government agrees not to appeal any fine that is greater than or equal to $40,000. The defendant also agrees not to appeal or bring a collateral challenge to any special assessment that is less than or equal to $100. The defendant also agrees not to appeal or bring a collateral challenge of any forfeiture amount that is less than or equal to $65,000,000, and the Government agrees not to appeal any forfeiture amount that is greater than or equal to $65,000,000. The defendant also agrees not to appeal or bring a collateral challenge to the forfeiture of the Specific Property referenced in this plea agreement. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

# Add. 5



The defendant hereby acknowledges that the defendant has accepted this Agreement and decided to plead guilty because the defendant is in fact guilty.

By entering this plea of guilty, the defendant waives any and all right to withdraw the defendant's plea or to attack the defendant's conviction or sentence, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material (other than information establishing the factual innocence of the defendant), including *Jencks* Act material, material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if the defendant is not a citizen of the United States, the defendant's guilty plea and conviction make it very likely that the defendant's removal from the United States is presumptively mandatory and that, at a minimum, the defendant is at risk of being removed or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, the defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. Under federal law, an individual may be subject to denaturalization and removal if the defendant's naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that the defendant has discussed the possible immigration consequences (including removal or denaturalization) of the defendant's guilty plea and conviction with defense counsel. The defendant affirms that the defendant wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw the defendant's guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge the defendant's conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the defendant's guilty plea and conviction.

It is further agreed that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

**Add. 6**



It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: Cecilia Vogel

Kiersten A. Fletcher
Samuel Raymond
Cecilia E. Vogel
Assistant United States Attorneys
(212) 637-2238/6519/1084

APPROVED:

Jessica Feinstein /CEV

Jessica Feinstein
Co-Chief, Money Laundering and Transnational Criminal Enterprises

AGREED AND CONSENTED TO:

Pablo Renato Rodriguez

03/08/2023
DATE

APPROVED:

Peter Katz, Esq.
Attorney for Pablo Renato Rodriguez

3-8-23
DATE